Roosevelt **ROLLERSON**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 17675.

United States Court of Appeals District of Columbia Circuit.

Argued April 13, 1964.

Decided Oct. 1, 1964.

Wilbur K. Miller, Circuit Judge, dissented.

determination in the pending habeas corpus proceeding. *Cf.* Gray v. Wilson, 230 F.Supp. 860, 861 (N.D.Cal.1964).

Mr. William H. Allen (appointed by this court), Washington, D. C., with whom Mr. James vanR. Springer, Washington, D. C., was on the brief, for appellant.

Mr. Max Frescoln, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WILBUR K. MILLER and WASHINGTON, Circuit Judges.

BAZELON, Chief Judge.

Rollerson appeals from two convictions: one for robbery and one for contempt of court during the robbery trial.

He claims that his insanity defense was not sufficiently rebutted by the psychiatrists' "conclusory" testimony that he suffered no mental disease.[1] He says the psychiatrists "usurped the function of the jury" by testifying to the "ultimate fact" of insanity rather than explaining the "basis of their conclusions."

Although we do not reverse this conviction, we think it necessary to point out that the value of a psychiatrist's testimony depends largely upon his opportunities for observation and the facts he observes. The testimony of an expert, like that of any other witness, may be excluded if it reports mere opin-

---

1. Appellant also claims the insanity instructions on the robbery charge gave the erroneous impression that the defendant bore the burden of proving insanity, contrary to the holdings in Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L. Ed. 499 (1895); and Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853 (1961). We do not so read the instructions.

Appellant urges a second error in the instructions: that the judge failed to tell the jury that it was not bound by the psychiatric conclusions but must apply a legal definition of insanity. The jury was given the standard instruction to this effect. We think it was enough in this case.

ion, unsupported by "underlying facts." [2] In its discretion, a trial court may require an expert witness to amplify his conclusions with an explanation of the basis for them.[3] This discretion should be exercised where evidence of either sanity or insanity appears inadequate. True, it is difficult to draw the line between underlying facts and conclusions.[4] On the issue of responsibility, moreover, the psychiatric conclusion that a man is or is not mentally diseased has evidentiary worth. A jury which must decide the issue of responsibility is aided by knowing whether qualified psychiatrists think there is some recognized psychiatric disorder to which the defendant's symptoms are referable. Yet the jury must make a determination of responsibility, not a clinical evaluation of disease. McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962). Thus, the conclusion of the psychiatrists that a man is "not mentally diseased" may not be enough in any particular case to meet the Government's burden of proving sanity beyond a reasonable doubt. The Government can best meet its burden by bringing forth from psychiatric witnesses both the conclusion of "no mental illness" and a full explanation of the dynamics of the defendant's personality.[5]

In the instant case, the jury's verdict was not against the weight of the evidence and, subject to the condition noted in Part II, we affirm the robbery conviction. However, the frequent failure to adequately explain and support expert psychiatric opinion threatens the administration of the insanity defense in the District of Columbia. We think it important to explicate this problem further, by reference to the trial record here and in Kimble v. United States, No. 17836, a pending appeal presenting similar issues.

2. See cases cited in Rheingold, *The Basis of Medical Testimony*, 15 VANDERBILT L.REV. 473 (1962). This rule is the foundation of the passage in Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957), in which we explained the ideal of expert testimony:

"The chief value of an expert's testimony in this field, as in all other fields, rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion; in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in his mere expression of conclusion. The ultimate inferences *vel non* of relationship, of cause and effect, are for the trier of the facts."

3. Compare ALI, MODEL CODE OF EVIDENCE, Rule 401:

"TESTIMONY IN TERMS OF OPINION: (1) In testifying to what he has perceived a witness, whether or not an expert, may give his testimony in terms which include inferences and may state all relevant inferences, whether or not embracing ultimate issues to be decided by the trier of fact, unless the judge finds

"(a) that to draw such inferences requires a special knowledge, skill, experience, or training which the witness does not possess or

"(b) that the witness can readily and with equal accuracy and adequacy communicate what he has perceived to the trier of fact without testifying in terms of inference or stating inferences, and his use of inferences in testifying will be likely to mislead the trier of fact to the prejudice of the objecting party.

"(2), The judge may require that a witness, before testifying in terms of inference, be first examined concerning the data upon which the inference is founded."

4. McCormick, *The Opinion Rule and Expert Testimony*, 23 TEX.L.REV. 109 (1945); 2 WIGMORE, EVIDENCE §§ 672-84; 7 *id.* § 1927 (3d ed. 1940).

5. "* * * [I]t would seem safe to conclude that the subsidiary medical facts of the case are accorded great weight since they are meaningful and readily remembered. This is notably so in the case of psychiatric testimony, where study has already demonstrated that the basis facts—case history, statements made by the patient, and the like—assume equal importance with the ultimate psychiatric opinion on sanity." Rheingold, *The Basis of Medical Testimony*, 15 VANDERBILT L.REV. 473, 474 n. 5 (1962).

Rollerson and Kimble are not unusual cases. Both defendants had ninety-day mental examinations in St. Elizabeths Hospital at public expense. Both had court-appointed counsel who raised the insanity defense with what evidence was available in light of reports from St. Elizabeths that the defendant was sane at the time of the crime and the crime was not a product of mental disease. Indigents like Rollerson and Kimble are largely dependent on the resources of the public system. But in both their cases, the public system has produced records in which the expert testimony is entirely conclusory, the questions perfunctory, the lay testimony unfocussed.

Rollerson's counsel raised the insanity defense by offering a letter he wrote to the jail authorities claiming they were trying to poison him and that "voices" were protecting him, a jail record showing that a sharpened object was found in his cell, and the testimony of a jail official that he had been placed in the maximum security part of the jail, "where we put the men who are a little off." In rebuttal, the Government offered two psychiatrists who testified that he "was not suffering from a mental illness or disorder" at the time of the crime and that "he could distinguish right from wrong" and "was able to exercise control over his actions and behavior." The

Government also put on a third psychiatrist who felt that "he has * * * a severe character disorder." "It is not a psychosis or neurosis, but it is considered as a mental disorder in that the individual —it is listed, shall we say—listed in the gray book of the nomenclature, and that also since 1957 was considered by St. Elizabeths as a mental disorder."

Kimble's counsel offered the defendant's father and sister who testified that over a period of three years, he had exhibited peculiar behavior, "rocking and reeling," "laughing to hisself," unaware of anyone around him. Dr. Dabney, a psychiatrists from St. Elizabeths, testified that a majority of the staff conference denoted him "a paranoid personality," that this was a mental disease, and that in his opinion the crime was a product of the disease. In rebuttal the Government put on Dr. Platkin, the head of the pavilion for the criminally insane at St. Elizabeths, who testified that "a paranoid personality" was not in his opinion usually a mental disease.[6]

No one hearing this testimony or reading these records could understand why either Rollerson or Kimble acted as he did. We know nothing of their childhood, their emotional structure, the major events of their lives, their day-to-day behavior, their personalities, their own explanations for their behavior. As it

---

6. This is a good example of "conclusory testimony." The psychiatrist testified flatly that he did not consider "paranoid personality" a mental disease. No one asked him and he did not volunteer any reasons or any explanation for this position. Yet it is a complicated position. The American Psychiatric Association's *Diagnostic and Statistical Manual* classifies "paranoid personality" as a mental disorder. Standard texts treat it as a personality pattern disturbance requiring treatment. See Ewalt & Farnsworth, TEXTBOOK OF PSYCHIATRY, Ch. 10 (1963). This authority says "Dynamic Psychiatry believes that these disturbances have their roots in the interaction between a person's biology, psychological development, and milieu (especially parents). The circumstances are such that he does not become psychotic, but lives his life defending against illness,

in a kind of 'brinksmanship.' " *Id.* at 126. Other authorities classify "paranoid personality" as a step on a continuum to full paranoia. See Noyes & Kolb, MODERN CLINICAL PSYCHIATRY, Ch. 26, Psychotic Disorders. It seems that paranoid personality is a mental condition which does not greatly disorganize a man. Thus, Dr. Platkin was probably testifying that a paranoid personality should be held responsible for his acts, not that he was free in an absolute sense from mental disease. The testimony was therefore "conclusory" in two senses: the witness was apparently testifying to a legal conclusion, *i. e.*, the defendant is responsible, rather than a medical opinion; and he stated his conclusion, *i. e.*, paranoid personality is not a mental disease, without explanation of its basis. He was thus performing a jury function, McDonald v. United States, *supra.*

stands, the testimony does little to help the jury answer the question whether either defendant has "any abnormal condition of the mind which substantially affect[ed his] mental or emotional processes [or] substantially impair[ed his] behavior controls." McDonald v. United States, *supra*, 114 U.S.App.D.C. at 124, 312 F.2d at 851.

Nor do we know what the psychiatrists who testified knew about the defendants. The only effort in either case to explain conclusions was Dr. Dabney's outline in *Kimble* of a paranoid personality: "overly sensitive in relationships with other people" ; "his conclusions about things are way out of proportion to actually what is happening around him" ; he "actually does not want to exist in the social world * * *." But cross-examination enmeshed the psychiatrist in this typical dialogue:

"A [Dr. Dabney] I said that [Kimble] has extreme sensitivity in his relationships with other people.

"Q What do you mean by that?

    *     *     *     *     *     *

"A In other words, in his daily living, a word, an innocent remark from someone else in the form of a joke, or kidding, may be interpreted by this individual as a gross insult.

"A pat on the back, a gentle shove in the person's bowel may be impressed upon this man as an assault of his person.

    *     *     *     *     *     *

"Q Can you tell us * * * whether he could distinguish between right and wrong?

"A I think that he can distinguish between right and wrong. He has a value set of what is right and what is wrong, but, due to his mental disorder, they are distorted.

"I mentioned, before you asked this question, that if someone kids him, he may interpret it as an insult. He is aware that to insult someone is wrong.

"He is aware that to push someone around is wrong, or to badger someone is wrong.

"But in his interpretations of things which influence his reactions to a particular situation, he tends to magnify it way out of the actual reality of the situation.

    *     *     *     *     *     *

"Q You stated, sir, that he is capable of distinguishing between right and wrong; is that correct?

"A Yes.

"Q Would you say, then, in being able to distinguish between right and wrong he can embrace the right and resist the wrong?

"A I am saying that by his mental disorder, by his distortions of thinking, that even though he knows right from wrong he inevitably does what is considered the wrong thing.

"Q * * * [C]an he embrace one and reject the other?

"A In his value system that depends on what he feels is right and wrong.

"Q You stated a moment ago that he knows it is wrong, I believe you stated, to push somebody; is that correct?

"A Or to inflict harm. Everyone has a sense of right and wrong.

"Q I am not talking about everybody; I am talking about him. You said that—

"A Well, in his value system, to shove someone is wrong. To harm someone is wrong. He is aware of this."

One difficulty is that the psychiatrist was at least as interested in how Kimble viewed acts others did to him as in how he viewed acts he did to others. The prosecutor's questions went only to the latter issue, so that the answers are clouded in ambiguity. The deeper difficulty is that the psychiatrist was trying to say that Kimble's ability to assess right and wrong responses was impaired by his hypersensitive reaction to what was done to him. Thus, in the midst of testifying that Kimble could "embrace the right and reject the wrong," the psychiatrist was perhaps saying the opposite.

The doctors in both cases arrived at their conclusions on the basis of "the

usual personal interviews and the physical examination, * * * a psychological examination which is a battery of tests designed to find out something about his degree of intelligence, * * * learning something about his aptitudes, feelings and personality characteristics." [7] A doctor testified that he saw Rollerson about twice a week on "ward rounds." In each case, all the doctors who testified had been present at an hour's staff conference at which the defendant was interviewed.

We are not told how many personal interviews of the defendant were conducted. We are not told the extent or content of the staff observations. We are told nothing about the tests the defendants took—what they were, what they are designed to show, how useful they are considered to be.[8] We are not told the men's scores on the intelligence or aptitude tests, much less what those scores mean. In Rollerson's case we are told nothing about the details of the staff conference—who was present, what questions were asked, what impression he made. We do not know what "ward rounds" are or how much time is involved on a typical ward round.

The basic tool of psychiatric study remains the personal interview, which requires rapport between the interviewer and the subject. Gill, Newman & Redlich, THE INITIAL INTERVIEW IN PSYCHIATRIC PRACTICE (1954). See also Finesinger, *Psychiatric Interviewing: Principles and Procedure in Therapy*, 105 AM.J.PSYCHIAT. 187 (1948). More than three or four hours are necessary to assemble a picture of a man. A person sometimes refuses for the first several interviews to reveal his delusional thinking, or other evidence of mental disease. Menninger, A MANUAL FOR PSYCHIATRIC CASE STUDY, ch. 1–4 *passim*. (2d ed. 1962) (hereafter cited as MENNINGER). See Noyes & Kolb, MODERN CLINICAL PSYCHIATRY, ch. 7 (with bibliography); Knight, *Borderline States*, 17 BULL. OF MENNINGER CLINIC 1, 8 (1953). Paranoid patients particularly may be able to guard against revealing their disorder with extraordinary skill. MENNINGER 64–65. See Noyes & Kolb, MODERN CLINICAL PSYCHIATRY 112–13. From hours of interviewing, and from the tests and other materials, a skilled psychiatrist can construct an explanation of personality and inferences about how such a personality would react in certain situations.[9] And he can explain his findings in nontechnical terms to a jury. The records here do not show how many interviews were conducted with these defendants or who conducted them. An-

7. Dr. Platkin, when asked the basis for his conclusion that Kimble was sane, said: "[A]t the time he came in he gave us something of a history of his life, as well as he could recall, from certain collateral information. We also had some history about his background. Certain tests were made. Certain observations were made. And all of this information put together was such that in my opinion there was no present mental illness * * *."

8. The only test discussed in any detail in either case was the electroencephalogram, or EEG. While useful to detect organic brain damage, it appears that the EEG is not completely accurate for that purpose and has no relation at all to serious mental diseases not resulting from or accompanied by organic abnormality. Ballek, SCHIZOPHRENIA—A REVIEW OF THE SYNDROME, pp. 180 ff. (1958).

9. Karl Menninger describes the ideal diagnostic summary:

"Finally, it is necessary to explain as well as we can how [the patient's mental condition] came about. This explanation should be written with a minimum of technical jargon and should endeavor to interpret the illness as seen in the light of background and environment in some logical way. It is not enough to say that a patient has a schizophrenic syndrome; why does this patient have the symptoms of that syndrome at this particular time, and what can we expect? This is what relatives and referring physicians and judges and others want to know * * *. The emphasis will differ in different cases, but the object is in all cases to explain as well as possible the relations of the various kinds of data to each other."
MENNINGER at 94.

other basic tool is the collateral study of those close to the subject. See MENNINGER 26 *et seq.* The record does not show whether there were any interviews of Rollerson's family, or any studies of his background. The psychiatrists seemed unaware of the existence of the information which Kimble's relatives told the jury.

█ It is axiomatic that a witness must explain the "observational basis" of his testimony—*i. e.*, what opportunity he has to observe, what tests he has performed—in order to meet even the test of admissibility. 2 Wigmore, EVIDENCE § 562. "* * * [I]f the trier believes ['the expert's opinions'] are logically arrived at, they are accepted; if not, they are rejected. It is precisely because the conclusions of the experts must be weighed in this fashion that it is necessary to probe their bases." United States v. Amburgey, 189 F.Supp. 687, 695–696 (D.D.C.1960). "Time and resources may not permit taking the psychosocial history of each person committed for a 90-day examination, or engaging in extensive personal interviews,

or making a collateral investigation. * * * But [the psychiatrists] should advise the court when they have been unable to make the kind of examination required by proper clinical standards because of lack of time, facilities or knowledge." Jackson v. United States, No. 18225, 118 U.S.App.D.C. 341, 336 F.2d 579, 583; decided Aug. 7, 1964 (separate opinion).

As far as the psychiatric testimony was concerned, Rollerson and Kimble might as well have been tried *in absentia.* They were not present in the conclusionary labels of the psychiatrists or in the perfunctory leading questions of counsel.

We do not intend to imply that the breakdown of meaningful presentation of evidence is the fault alone of the psychiatrists. Lawyers seem not to ask questions which would elicit meaningful responses. They should approach psychiatric witnesses with the same probing skill with which they question doctors about whiplash injuries or with the attention to detail which they apply to "the chain of possession" when some piece of physical evidence is introduced.[10] The

---

10. See the suggested questioning in Flannery, *Meeting the Insanity Defense,* 51 J.CRIM.L. 309, 315 (1960); Goldstein & Fine, *The Indigent Accused, the Psychiatrist, and the Insanity Defense,* 110 U.PA.L.REV. 1061, 1064–65 (1962), describe the relationship between the psychiatrist and the defense counsel:

"It is far easier to agree on the importance of the psychiatric witness to the defense than on the functions he should perform. All to often it is assumed that he is needed only to examine the accused before trial and to appear as a witness at the trial. Yet if the issues are to be clearly defined and developed by the parties in the manner contemplated by an adversary system, it will be necessary for him to do much more. Expert testimony does not arise full-blown. It must be prepared with a sensitive concern for the context in which it is to be presented. Problems of communication must be met and overcome. Stereotypes entertained by lawyer and expert must be dispelled. Assumptions and workways must be explored and understood.

"The very first contact between lawyer and psychiatrist, the request that

a mental examination be performed, provides a useful illustration. Unless each has some sense of the purpose of the examination, it will not be satisfactory one. [*sic*] If, for example, that purpose is to ascertain competence to stand trial, it may call for different procedures than if the purpose is to determine sanity at the time of the crime or to determine whether civil commitment is presently warranted. The length and nature of the interviews, the need for psychological and neurological tests, the gathering of the defendant's life history—all will depend upon the degree to which the lawyer understands where the psychiatrist's competence ends and that of psychologists, neurologists, and other specialists begins, and the degree to which psychiatrists understand enough about a trial to appreciate their limited role in it.

"Ideally, this preparation will make clear to the psychiatrist that his testimony is merely one stage in a series of phased presentations of material; that the ultimate objective of his testimony and of the rules of evidence which control its presentation is the portrayal

paucity and poverty of the psychiatric testimony in these and other cases may be a result of the difficulty of the concept of insanity, and the relative recency in this jurisdiction of a rule which allows a wide range to psychiatric testimony. The failure to explore the issue of responsibility may also be the result of inadequate resources. See Jackson v. United States, No. 18225, 118 U.S.App.D.C. 341, 336 F.2d 579, decided Aug. 5, 1964; Adams v. United States, 119 U.S.App. D.C. ——, 337 F.2d 548, decided Sept. 21, 1964 (dissenting opinion); Criminal Justice Act, P.L. 88–455, Aug. 20, 1964, 78 Stat. 552. Where the community fails to supply—for those who cannot—the effort and resources required for an adequate exploration of the issue, the trial becomes a facade of regularity for partial justice.

## II

During the trial, Rollerson threw a water pitcher which struck the prosecutor on the shoulder. After the jury returned a guilty verdict on the robbery charge, the court found appellant guilty of crim-

inal contempt for throwing the water pitcher and sentenced him to serve an additional year, consecutive to the robbery sentence.[11]

The court tried the contempt under the summary provisions of Rule 42(a), FED.R.CRIM.P.[12] In Panico v. United States, 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed. 2d 1 (1963), the Supreme Court reviewed a contempt conviction arising from Panico's conduct during his narcotics trial. The Court agreed that Panico's conduct was contumacious if he was responsible for his conduct. But there had been conflicting expert testimony about Panico's competency to stand trial for the narcotics offenses; and shortly after the contempt conviction, he was found to be suffering from schizophrenia and committed to a mental hospital. The Supreme Court held that "the fair administration of federal criminal justice requires a plenary hearing under Rule 42 (b) of the Federal Rules of Criminal Procedure to determine the question of the petitioner's criminal responsibility for his conduct."[13] We think the same is true here.

of this defendant and his act in terms meaningful to judge and jury. In pursuit of that objective, he must not be tempted to out-lawyer the lawyers. He is not obligated to manipulate concepts to attain objectives he thinks desirable; nor is he obligated to offer his opinion on matters of which he has no knowledge.

"If this exploration of issues does occur before the psychiatrist conducts his examination, it will inevitably educate the lawyer in some of the intricacies of psychiatry so that he will be better equipped to perform his role. The lawyer who is unfamiliar with the point at which knowledge of mental life slides over into conjecture can hardly be expected to examine his own witness skillfully, much less his adversary's, or to make intelligent decisions about the kinds of witnesses he needs to prove or disprove various illnesses. He must be familiar with the usage of terms like 'schizoid' or 'paranoid,' their relation to the psychoses of schizophrenia or paranoia, the distinction between an acute state and a state of remission, the psychotic's often rational behavior, and the manner in which

hallucinations and delusions differ from daydreams and firm convictions."

11. Appellant was subsequently tried and convicted, by a jury, on assault charges growing out of the water pitcher incident. He received another sentence of 1–3 years, to be served after completion of the sentences imposed in the case here under appeal.

12. "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record."

13. Id. at 31, 84 S.Ct. at 20. Rule 42 (b) provides: "A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on applica-

Perhaps the mere fact that Rollerson presented enough evidence to raise a jury question about his responsibility for the robbery in July would not require a Rule 42(b) hearing for the contempt committed in February. But the insanity testimony presented by the defense related to incidents in the prison which occurred within a month or two before trial. And the diagnosis at St. Elizabeths Hospital, upon which Dr. Dabney based his conclusion that Rollerson was insane, was made between October and December. Thus there was a substantial issue of Rollerson's responsibility for his conduct at trial, and the contempt conviction must be reversed for new proceedings under Rule 42(b).[14]

The question of Rollerson's responsibility for his courtroom conduct affects our disposition of his robbery conviction as well. As we have noted, the jury's verdict is sustained by the evidence. However, Rollerson's conduct at trial was sharply prejudicial to the jury's consideration of his defense. If his acts resulted from mental illness, they suggest that he was unable at the time to assist in his defense. Thus, a serious question would arise whether he was also incompetent to stand trial. On the facts of this case, we think that the District Court, if it determines that Rollerson's acts thus resulted, must vacate his conviction and order a new trial, which should be held only after it has been judicially determined that Rollerson is competent to stand trial.[15]

Since Rollerson's contempt conviction, a majority of the Supreme Court has indicated in United States v. Barnett, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964), that the punishment which may be imposed after a non-jury contempt conviction is limited to that provided for petty offenses. The Supreme Court did not specify further, but we think we may take our guide from the D.C.Code provision governing trial by jury.[16] D.C.CODE, § 11–715a, whose constitutionality was upheld in District of Columbia v. Clawans, 300 U.S. 617, 57

tion of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment."

14. Appellant claims the water pitcher incident so prejudiced the jury's consideration of the robbery charge that there should have been a mistrial. In the alternative he argues that if he was not entitled to a mistrial because the prejudice was his own fault, then he will be entitled to a mistrial if in the *Panico* hearing it is found he was not responsible for his courtroom conduct. Whether in either circumstance a mistrial was in order, defense counsel did not request one. Rather he agreed to the court's suggestion that the jury be charged to ignore the incident except as it might shed light on Rollerson's insanity defense. In these circumstances, we think the court's failure to declare a mistrial is not error. However, if the *Panico* hearing results in a finding that appellant was not responsible for his courtroom conduct, we think for other reasons a new trial must be granted, note 15 *infra*.

15. See Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), where the Supreme Court recognized that the difficulty of determining mental states at a prior time would justify such a disposition in appropriate cases; see also Sullivan v. United States, 205 F.Supp. 545 (S.D.N.Y.1962); compare Kelley v. United States, 95 U.S.App.D.C. 267, 221 F.2d 822 (1954); Wear v. United States, 94 U.S.App.D.C. 325, 218 F.2d 24 (1954); Perry v. United States, 90 U.S.App.D.C. 186, 195 F.2d 37 (1952). Although counsel has not raised the point, we feel we must notice it; conviction of an incompetent "violates certain immutable principles of justice which inhere in the very idea of free government." Sanders v. Allen, 69 App.D.C. 307, 310, 100 F.2d 717, 720 (1938).

16. We do not think the definition of petty offense contained in 18 U.S.C. § 1— one carrying a penalty of up to $500 fine and/or six months imprisonment— applies here.

S.Ct. 660, 81 L.Ed. 843 (1937), allows the Court of General Sessions to proceed without a jury in criminal cases where the offense carries a penalty of up to ninety days, but guarantees a right to jury trial for all offenses which may be punished by imprisonment for more than ninety days. Accordingly we think it proper to instruct the District Court that if on remand it proceeds without a jury, it can impose no greater imprisonment than ninety days.[17]

So ordered.

WILBUR K. MILLER, Circuit Judge, dissents.

17. Without deciding whether the limit may in fact be less than three months, we note that even in 1936 this court thought three months was too much, Clawans v. District of Columbia, 66 App.D.C. 11, 84 F.2d 265 (1936). And although the Supreme Court reversed, Mr. Justice Stone's opinion for the Court recognized that:

" * * * commonly accepted views of the severity of punishment by imprisonment may become so modified that a penalty once thought to be mild may come to be regarded as so harsh as to call for the jury trial, which the Constitution prescribes, in some cases which were triable without a jury when the Constitution was adopted." 300 U.S. at 627, 57 S.Ct. at 663.