**UNITED STATES of America**

v.

**William H. CALLOWAY, Appellant.**

**No. 73–1139.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 1974.

Decided June 19, 1974.

Rehearing Denied Aug. 30, 1974.

3. The earlier decision is reported at 199 NLRB No. 53.

James R. Loftis, III, Washington, D. C. (appointed by this Court), for appellant.

Douglas M. Jackson, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, John A. Terry, Asst. U. S. Atty., and Broughton M. Earnest, Asst. U. S. Atty., at the time the brief was filed, were on the brief for appellee. Earl J. Silbert, U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, McGOWAN, Circuit Judge, and CHRISTENSEN,* Senior District Judge for the District of Utah.

BAZELON, Chief Judge:

Appellant, who was seventeen years old at the time of the alleged offenses, was tried and convicted as an adult, and received concurrent ten year sentences under the Federal Youth Corrections Act.[1] On appeal he claims that he was denied a speedy trial by the fifteen month delay between arrest and trial, during which time he was incarcerated in the D.C. Jail. In a judgment entered February 26, 1974, 492 F.2d 669, this court reversed appellant's convictions and ordered dismissal of the indictment "for lack of a speedy trial." We announced that this opinion would follow.

I

Appellant was arrested on July 15, 1971. According to the police he confessed to participating in a robbery-burglary, but denied participation in any rape. Nonetheless, he was charged solely with rape. On the basis of this charge, appellant, pursuant to a recent amendment to the D.C.Code,[2] was treated as an "adult" despite his age of seventeen years. Because he was unable to post a $10,000 bond, he was confined in the D.C. Jail.

On November 2, 1971, four months after his arrest and confinement, appellant and three co-defendants were charged in a superseding indictment with robbery, burglary, rape and assault with a deadly weapon. Shortly thereafter, counsel were appointed, and bail was reset at $5,000 despite a recommendation by the D.C. Bail Agency that appellant be released to the custody of his mother.

On November 26, 1971, appellant filed motions to suppress his confession on the ground that it was coerced by promises and threats, and to dismiss his indictment on the ground that the statute classifying him as an "adult" was a denial of due process. No action was taken on the motion to suppress for more than seven months. The motion to dismiss the indictment was denied without hearing one week after it was filed.

At a status hearing on January 17, 1972, trial was set for April 17. Appellant filed a motion for release on personal recognizance on February 9, but this motion was not acted upon. On March 29, 1972, appellant's court appointed counsel moved to withdraw from the case on the ground that they were "unable to achieve any significant degree of communication with the defendant." The court denied this motion without stating reasons. Counsel also moved on March 29 for a mental examination of Calloway alleging only that "[i]t has come to [our] attention that the physical and mental well-being of our client

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 18 U.S.C. § 5010(c).

2. 16 D.C.Code § 2301(3)(A) provides:
   The term "child" means an individual who is under 18 years of age, except that the term "child" does not include an individual who is sixteen years of age or older and—
   (A) charged by the United States Attorney with (i) murder, forcible rape, burglary in the first degree, robbery while armed, or assault with intent to commit any such offense, . . .
   This court upheld the constitutionality of this statute over Judge Wright's strenuous dissent. United States v. Bland, 153 U.S. App.D.C. 254, 472 F.2d 1329 (1972), cert. denied, 412 U.S. 909, 93 S.Ct. 2294, 36 L. Ed.2d 975 (1973). Compare Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed. 2d 84 (1966).

very well might be in question at this time." (The record discloses that after conviction, at a hearing on bond pending appeal, appellate counsel, who was not trial counsel, advised the court that he had been informed by trial counsel that the March 29 motion for a mental examination "was necessitated by the fact that the defendant got ahold of some drugs while he was incarcerated [at the D.C. Jail] and in fact had a seizure and I believe there was a bench conference, not reflected in the transcript, during which this was brought to the court's attention." In addition, after oral argument in this court, counsel lodged a contemporaneous memorandum of trial counsel, concerning the March 29th motion for a mental examination, which reads in pertinent part:

> [Trial counsel] were told that Calloway had had a seizure, involving tightening of his mouth muscles, throat, tongue and knees. The Marshal told us that defendant claimed to have taken 10 benzadrine capsules yesterday . . . Defendant refused to see both of us. . . . When a nurse passed, I asked her whether or not defendant was faking. She said that he was not. That she actually saw the spasm and this was the 3rd such case she had seen this week involving benzadrine at D.C. Jail.

The court granted appellant's motion and ordered that the examination be conducted by the Office of Forensic Psychiatry rather than Saint Elizabeths Hospital for the express purpose of expediting the report and insuring its completion before "the trial date which is set for April 17, 1972."

On April 17 two of Calloway's co-defendants pled guilty, and the U. S. Attorney indicated that the charges against the third co-defendant would be dropped upon imposition of a sentence in another case. The court then stated that, despite its order requiring appellant's psy-

chiatric report to filed by that date, the report had not yet been filed. Trial was reset for June 12, 1972.

The report of the Office of Forensic Psychiatry is dated June 1, 1972, but so far as we can determine it was never made a part of the record below, nor is it noted on the district court's docket sheet. We obtained a copy of the report from the Office of Forensic Psychiatry. In its entirety, it reads:

> In response to your Order, this 20 year old inmate was examined at the District of Columbia Jail on April 11, 1972, with a follow-up exam on May 2, 1972.

> He was found on psychiatric evaluation to be competent to understand the proceedings against him and to assist counsel in his own defense. Furthermore, he was found to have no major mental illness which would have substantially impaired his mental processes or behavioral controls; nor did any such illness seem to exist during the period of the alleged offenses.[3]

On June 12, the date set for trial, defense counsel advised the court that the psychiatric report, dated June 1, "has not yet been prepared." The U. S. Attorney stated that his office had not contacted the Office of Forensic Psychiatry with respect to Calloway's examination. The court asserted that it would "get on Forensic Psychiatry myself today and we will get something in here by the end of the week." The U. S. Attorney then suggested that a hearing be set on appellant's motion to suppress, which had been filed seven and one half months earlier, and stated that if Calloway prevailed the government "might not be able to go forward," and if he lost, appellant might enter a plea.

The suppression hearing commenced on June 23; it was continued so that the government could call a rebuttal witness, then continued again for an unstated reason until July 7, 1972, at

---

3. This court has disapproved of such useless conclusory reports on numerous occasions. *See, e. g.,* Washington v. United States, 129

U.S.App.D.C. 29, 390 F.2d 444 (1967); Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269 (1964).

which time the motion to suppress was denied. Trial was then set for July 27, 1972.

On July 24, the government requested a continuance because one of the prosecutors assigned to the trial might be trying another case, and because several government witnesses were in New York, and therefore would be unavailable on July 27. The defense objected to the continuance since "this man has been locked up since July 15 of last year." The court responded "Also for something other besides this, as I recall." Counsel corrected the court, stating that appellant was confined solely because of the present charges, and asked the court to reconsider appellant's motion for release. Although the court informed counsel that it would grant the motion if the juvenile authorities would assume custody of Calloway, it later changed its mind because:

> I didn't realize this rape was in here. We may have to do some rethinking about the bond. . . . You had better make a written motion.

The court then granted the government's motion for a continuance, and trial was set for October 18, 1972. No written motion for release was subsequently filed, apparently because the juvenile authorities refused custody of Calloway because of his adult charges.

On October 10, 1972, appellant's counsel filed a motion for dismissal of his indictment for lack of a speedy trial, claiming that he was prejudiced both by his continuous incarceration, and in the preparation of his defense since he "has had difficulty in relating to counsel an exact description of where he was at the time and on the date the alleged offense occurred." This motion was denied after hearing on October 13, 1972. On October 17, the trial date,[4] appellant filed a

pro se motion to dismiss for want of a speedy trial, which was also denied.

At trial the government showed that a brutal robbery-burglary-rape had taken place, although none of the victims could identify any assailant. The evidence against appellant consisted of his fingerprint at the scene of the crime, his confession, and the reluctant [5] testimony of a co-defendant, who had pled guilty, that Calloway was with him when he committed the robbery, but that he, the co-defendant, "didn't see no rape." At the close of the government's case, the court granted a defense motion for judgment of acquittal on the rape counts.

Appellant testified that he could not remember where he was on the specific night in question, but said he was probably at his brother's house since he usually spent his evenings there. He stated that the fingerprint at the scene of the crime was not his, and that his signed confession was secured by threats.

Upon conviction Calloway was returned to the D.C. Jail where he remained until January 5, 1973, when at the request of the government he was committed to the Medical Facility at Springfield, Missouri, for evaluation under the Youth Corrections Act. On the basis of the Springfield report, he was given a youth sentence despite government allocution for an adult sentence. Finally, on June 6, 1973—seven and a half months after his conviction, and almost two years after his arrest—Calloway was transferred to the Lorton Youth Center for "rehabilitative treatment."

## II

■■■ Calloway's sole contention is that he was denied a speedy trial by the fifteen month delay between his arrest

---

4. The trial commenced one day ahead of schedule.

5. At first, the witness testified that Calloway did not accompany him on the night of the robbery. Then, after the court read the

witness his testimony at the time his plea was taken which stated that Calloway was with him at the time of the crime, and threatened the witness with a perjury charge, he testified that Calloway was with him.

and trial. In this jurisdiction a delay of more than one year raises a speedy trial claim of prima facie merit.[6] And in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court enumerated three factors other than the length of delay that should be considered in weighing a speedy trial claim: (a) the reasons for the delay; (b) the defendant's assertion of his right to a speedy trial; an.ᵈ (c) the prejudice to the defendant.

## A. *Reasons for Delay*

Appellant was arrested on July 15, 1971, but was not indicted until November 2, 1971. There is nothing in the record, nor has any reason been brought to our attention, to explain this delay. Particularly since Calloway was incarcerated during this time, the government was obliged to proceed swiftly.

■ The time between arraignment on November 15, 1971, and the original date set for trial—April 17, 1972—was occupied with what is called the "deliberate pace of the system,"[7] which included a mental examination of appellant's co-defendant, the filing of several motions by appellant, and a busy court calendar. During this period, appellant moved for a mental examination, and in ordering the examination the court took pains to insure that the trial date would not thereby be delayed. Nevertheless, as indicated above, the delay in the examination and the filing of the report caused a trial postponement of more than three months until July 27, 1972.

In these circumstances this three month delay cannot, as the government argues, be attributed to appellant simply because he moved for the examination.

■ Finally, since the government moved for a continuance, it must bear the responsibility for the delay from July 27, 1972, to the actual date of trial, October 17, 1972. The government attempts to justify this continuance on the ground that it needed the time to secure out-of-town witnesses. The July 27 trial date was set on July 7, and the government offers no explanation as to why it could not produce witnesses from New York City in this period. In light of the lengthy delay that had already occurred, and appellant's continued confinement, these three months were highly significant.[8]

## B. *Assertion of the Right*

■ The government argues that Calloway's "failure to assert his . . . right [to a speedy trial] until the very eve of trial weighs heavily against his claim . . ."[9] The government fails to acknowledge, however, that Calloway continued throughout the fifteen months to press his motion for release pending trial. Since the harm suffered by the delay was the personal prejudice to appellant resulting from confinement at the D.C. Jail,[10] his motion for release was for all relevant purposes the functional equivalent of pressing his right to a speedy trial. In any event, the obligation is on the government to bring a defendant to trial,[11] and

---

6. Hedgepeth v. United States, 124 U.S.App. D.C. 291, 364 F.2d 684 (1966). *See also* United States v. Dunn, 148 U.S.App.D.C. 91, 459 F.2d 1115 (1972); United States v. Holt, 145 U.S.App.D.C. 185, 448 F.2d 1108 (1971). Indeed, this court has recently viewed with disfavor delays of less than one year. *See* United States v. Parish, 152 U.S.App.D.C. 72, 468 F.2d 1129 (1972); United States v. Ransom, 151 U.S.App.D.C. 87, 465 F.2d 672 (1972).

7. *See, e. g.,* United States v. Bishton, 150 U.S.App.D.C. 51, 463 F.2d 887 (1972); United States v. Canty, 152 U.S.App.D.C. 103, 469 F.2d 114 (1972).

8. *See* Hedgepeth v. United States, 124 U.S. App.D.C. 291, 364 F.2d 684, 688 (1966) ("The passing of such a considerable length of time, no matter who is 'at fault,' should act as a spur to the Government to seek prompt trial. If the Government is lax in this regard, it is appropriate to take the earlier period into account . . .").

9. Government Brief at 16.

10. *See* section C *infra.*

11. *See* Barker v. Wingo, 407 U.S. 514, 527, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); United States v. Holt, 145 U.S.App.D.C. 185, 448 F.2d 1108, 1111 (1971) (opinion of Leven-

when the defendant is confined pre-trial the government must assume he desires a speedy trial unless he indicates the contrary.[12]

■■ Indeed, in the instant case the government itself failed to comply with its obligation under Rule 46(g) of the Federal Rules of Criminal Procedure [13] to file a bi-weekly report advising the court of the reasons for appellant's continued incarceration.[14] The purposes of this Rule are to require the government to share the burden of preventing unnecessary pre-trial confinement, and to keep the trial court on notice of the special need for a speedy trial since the defendant is confined.[15] In the face of its own dereliction the government is clearly not in a position to claim that appellant should be penalized for failing to press his right.

## C. *Prejudice*

In *Barker, supra*, the Court indicated that "[p]rejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect."[16] The Court identified three such interests, the first of which is "to prevent oppressive pre-trial incarceration" because:

[t]he time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it en-

forces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time.[17]

■ The personal prejudice resulting from pre-trial incarceration was exacerbated in the present case by two factors. First, the defendant was a youth being confined in an adult jail. As Judge Wright warned in his dissent in United States v. Bland, 153 U.S.App.D.C. 254, 472 F.2d 1329, 1349–1350 (1972)—in which this court upheld the D.C. statute permitting youths aged 16 and 17 to be tried as adults solely on the basis of the charge filed by the prosecutor—"*I am confident that a child is unlikely to succeed in the long, difficult process of rehabilitation when his teachers during his confinement are adult criminals.*" Subsequent events have shown that this confidence was well placed. Speaking of the D.C. Jail—the institution in which Calloway was confined for almost two years [18]—Judge Wright later wrote:

The recent prisoners' riot . . . tragically demonstrates the inhumanity as well as the danger of treating children as adults for the purposes of correction and rehabilitation. Apparently one of the causes of the prison riot was the homosexual assaults by the adult prisoners on the 16- and 17-year old children being held in the jail as "adult" prisoners.[19]

---

thal, J.) ("In our jurisdiction it is peculiarly appropriate to hold the Government to the obligation of arranging a speedy trial.").

12. *See* Barker v. Wingo, *supra*, 407 U.S. at 527, 92 S.Ct. 2182.

13. Rule 46(g) provides:
. . . The attorney for the government shall make a biweekly report to the court listing each defendant and witness who has been held in custody pending indictment, arraignment or trial for a period in excess of ten days. . . . As to each defendant so listed the attorney for the government shall make a statement of the reasons why the defendant is still held in custody.

14. The government's brief fails to address the issue of why it neglected to comply with

its obligation in this case. At oral argument the government indicated that its dereliction with respect to the requirements of Rule 46(g) extends beyond the instant case.

15. *See* 1966 Committee Note to Rule 46, Federal Rules of Criminal Procedure; H.R. Rep.No. 91–907, 91st Cong., 2nd Sess. (1970).

16. 407 U.S. at 532, 92 S.Ct. at 2193.

17. *Id.* at 532–533, 92 S.Ct. at 2193.

18. *See* pp. 313–315, *supra*.

19. United States v. Bland, 153 U.S.App.D.C. 254, 472 F.2d 1329, 1351 (1972) (Statement of Wright, J., as to why he would grant rehearing *en banc*).

The record in this case, too, lends heavy support to the view that confining young offenders with hardened criminals is equivalent to simply abandoning them. In Calloway's jail records there are several entries in which he claims he was homosexually assaulted by other inmates. Moreover, Calloway (and apparently others) were able to secure enough drugs to induce a seizure. As a result he became so hostile and uncommunicative that his lawyers requested permission to withdraw from the case. Finally, when, after serving two years in the D.C. Jail, Calloway was sentenced under the *Youth* Corrections Act, he immediately "tr[ied] to be a leader of his peers . . . [by] impress[ing] the other inmates with his belligerent attitude." [20] From the date of his arrival at the Youth Center the authorities noted that he "will probably be a problem in the future."

The second factor exacerbating the prejudice from incarceration in this case was Calloway's background when he arrived at the D.C. Jail. The Supreme Court in *Barker* pointed to the "detrimental impact on the individual" caused by the "dead time" spent in jail. For Calloway that "dead time" was especially deadly. He was the sixth of seven children born to a rural Georgia family that moved to Washington when Calloway was five. His social files and sentencing reports [21] indicate that his father had a "severe drinking problem," and therefore was "unemployed much of the time." Moreover, the father apparently did "not show much interest in his entire family," and the familial responsibilities fell upon Calloway's mother who is described as "intellectually limited, and . . . suffer[ing] from a hearing problem and a bad heart."

"She appears to be overwhelmed with her responsibilities of caring for the family," which, besides her seven children, included seven grandchildren. All sixteen people lived in a six room, $95 per month, apartment that was eventually condemned. Particularly in recent years, they were supported largely by public assistance.

Calloway himself received little schooling, and his records indicate an achievement level of mid-fourth grade and an I.Q. test score between 75 and 80. He claims his closest childhood friends were his two older brothers who were nearest in age to him; both of these youths have serious criminal records (the older one is presently serving a sentence for murder). Calloway was first arrested at age nine, and despite—or perhaps because of—the fact that he spent his young life revolving in and out of juvenile institutions he developed no useable academic or vocational skills, as tests at the Lorton and Springfield Youth Centers [22] showed. Between ages nine and eleven he was charged with ten different offenses, most of which were in the nature of petty thefts committed so that Calloway could have money for "candy and other articles."

The juvenile caseworkers assigned to Calloway realized from the outset that he was the "product of a socially disorganized, very deprived home situation," and that his family "was in need of counselling for their many family problems." Nonetheless, the records reflect that no such counselling was forthcoming.

At age eleven Calloway was placed in the Maple Glen Children's Center where he remained for almost a year. Shortly after his release he ceased attending school and started staying out all night;

---

20. This and the following quotation were taken from appellant's file at the Lorton Youth Center.

21. The information contained in this and the following paragraph was taken from appellant's juvenile social file, his presentence report in this case, his Youth Act evaluation

report done at the Federal Penitentiary at Springfield, Missouri, and his file at the Lorton Youth Center.

22. Calloway's section 5010(e) study was prepared at the Federal Penitentiary at Springfield, Missouri.

as a result he was returned to the Children's Center for another ten months and was released because "his adjustment was good." Immediately following release two additional charges were filed against him and he was sent to the juvenile facility at Cedar Knoll where he remained for ten months. After release he was again arrested and returned to Cedar Knoll from which he absconded. He apparently became a user of heroin, committed several more offenses and was committed to the juvenile home at Oak Hill. Six months later he escaped, and within a month allegedly committed the offense that led to his arrest in this case.

Calloway's presentence report indicates that "he appears to have been easily led into th[is] offense by more aggressive delinquent peers." His psychological evaluation at the Lorton Youth Center states that he "wants to be accepted by his peers and be a part of the 'in' crowd." Yet, without good reason, this youth was allowed to languish for almost two years in the D.C. Jail where his companions and role models included hardened and sophisticated criminals. Of course, we cannot be certain that had Calloway been spared these two years in the D.C. Jail subsequent events would have been different. But after suffering such a devastating childhood Calloway may have had only a bare chance of reversing the only way of life he knew. That chance was not simply prejudiced by his confinement in the D.C. Jail; it was, as subsequent events reveal,[23] destroyed.

Nothing in the record suggests that anyone who participated in these proceedings from arrest to sentencing sought to prevent Calloway from receiving the special care he so badly needed. It would appear rather that institutional pressures—created, for example, by "the deliberate pace of the system"—resulted in indifference to Calloway's plight. Nevertheless, numbness to the needs of people like Calloway, from whatever source, is intolerable. "The worst sin towards our fellow creatures is not to hate them but to be indifferent to them: that is the essence of humanity . . ."[24]

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER

PER CURIAM.

On consideration of appellee's suggestion for rehearing *en banc* and a majority of the Judges of the Court in regular active service not having voted in favor of such rehearing, it is

Ordered by the Court *en banc* that the aforesaid suggestion is denied.

Circuit Judges TAMM, ROBB and WILKEY would grant appellee's suggestion for rehearing *en banc*.

Circuit Judge MacKINNON would also grant the suggestion. Circuit Judge MacKINNON is of the opinion that the panel opinion misapplies Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed. 2d 101 (1972) and 23 D.C.Code § 1303

23. Calloway was eventually released pending resolution of this appeal to the third party custody of Bon-A-Bond, a community-based rehabilitation program staffed by former inmates. His records indicate that he progressed well during his first three months: "Mr. Calloway becomes more and more involved as the days go by. His attitude and behavior continues [*sic*] to improve." In late January, however, as his appeal drew near, he stayed away an extra day on a weekend pass, and when he returned he was reported for "rais[ing] hell" in the dining room. As a result Bon-A-Bond informed him that they would no longer accept custody and he would be returned to prison. He called his attorney, and said he would flee rather than return to prison. Despite counsel's pleadings, he fled. Recently, the Clerk of this court was notified that Calloway is presently incarcerated in a Georgia jail—near where he was born—charged with burglary.

24. George Bernard Shaw, Devil's Disciple, Act II (1901).

(h)(6)[1] and is contrary to our opinion in Smith v. United States, 135 U.S.App. D.C. 284, 418 F.2d 1120 (1969). Also the time he was in jail pre-trial is credited on his sentence and there was no demonstrated prejudice to his defense.

1. 23 D.C.Code § 1303(h)(6) provides:
The [Bail] agency shall—
prepare, in cooperation with the United States marshal for the District of Columbia and the United States attorney for the District of Columbia, such pretrial detention reports as are required by Rule 46(h) of the Federal Rules of Criminal Procedure;