**In re Jerome CURRY, Patient.**

**No. 71–1798.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 8, 1971.

Decided Oct. 19, 1971.

Fahy, Senior Circuit Judge, did not participate in the opinion.

---

Mr. Robert J. Golten, Washington, D. C., for appellant.

Mr. James F. Flanagan, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the pleadings, for appellee.

Before BAZELON, Chief Judge, FAHY,* Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

PER CURIAM:

On September 27, 1971, Jerome Curry appeared at the George Washington University Hospital complaining of electronic devices in his head which were controlling his behavior, and stating that he heard voices telling him to "go die," and "leave." After interviewing Curry, a doctor at the hospital advised him, for reasons that the papers before us do not make entirely clear, that he could not be admitted for treatment at George Washington. The doctor further suggested that he file an application for treatment at St. Elizabeths, which Curry was unwilling to do. The doctor then executed an application for emergency hospitalization,[1] and sent him in an ambulance to St. Elizabeths. There is some indication that Curry reaffirmed at St. Elizabeths his desire to be treated as a voluntary patient, although at argument the government disclaimed any knowledge on the issue. The hospital admitted Curry as an involuntary, emergency patient pursuant to D.C. Code § 21–522.

Before the expiration of the 48-hour commitment authorized by § 21–522, the hospital petitioned the District Court, pursuant to § 21–523, for "an order authorizing the continued hospitalization of the person for emergency observation and diagnosis for a period not to exceed 7 days from the time the order is entered." At a hearing, to which Curry was entitled by § 21–525, Curry contended that emergency hospitalization was barred because (1) he had requested voluntary treatment and should have been admitted on that basis; (2) there was no evidence at the time of admission that he was likely to injure himself or others, as § 21–522 requires; and (3)

---

* Senior Circuit Judge Fahy did not participate in this opinion.

1. The document, which identified Curry as a resident of Miami, Florida, was signed by the doctor as "physician of the patient named below," after striking out the word "family" preceding "physician" in the form. One of the questions in the case is whether this physician's application satisfies the statutory requirement of an application by the physician of the person.

The application states as the "circumstances under which said patient was taken into custody and the reasons therefor" the following, in handwriting: "Patient feels there are electrical devices in his head which are controlling his behavior. In addition, he hears voices which are telling him to 'go die,' and 'leave.' He has had this problem since Feb., 1971, & was hospitalized briefly in Calif. but signed out AMA."

because he was receiving no treatment during the seven-day observation period. The District Court rejected these contentions and ordered Curry's hospitalization. Curry moved in this Court for summary reversal.

In his pleadings before this Court and at oral argument counsel for Curry raised the following issues:

1. If a person seeks treatment in the first instance as a voluntary patient, can St. Elizabeths deny him "the right to be a voluntary patient" and treat him on an involuntary basis?

2. If a person falls within the class of persons who can be committed involuntarily, is the hospital required by statute to disregard his request for voluntary treatment and treat him on an involuntary basis?

3. What standards must the hospital apply in concluding that a person is likely to injure himself or others and therefore a suitable case for involuntary commitment under § 21–522?

4. Where a person held involuntarily under § 21–522 requests a hearing under § 21–525, what sort of hearing does the statute require? Is he entitled to a hearing on whether there was probable cause to consider him dangerous? Was the District Court in error in ruling that the only purpose of such a hearing is to determine whether the statutory procedure had been followed in admitting and holding appellant, i. e. whether there was a proper application for admission under § 21–521, and a proper certificate by admitting psychiatrists under § 21–522?

5. Where a person is held involuntarily under § 21–522, must he be advised that he has a right to a hearing to test the validity of the commitment? Does he have a right to the assistance of appointed or retained counsel in challenging the commitment?

6. Is the hospital required to provide some form of treatment to persons held for seven-day emergency observations?

All of these contentions have importance, but one must be resolved immediately. Curry alleges that he was committed to Eastside Service at St. Elizabeths, a facility with 420 patients and, at the time of Curry's hearing, no attending psychiatrist. The District Court rejected the theory of a right to treatment during the period of observational commitment as "clearly frivolous" on the grounds that the purpose of the seven-day commitment was merely observation and diagnosis. The District Court's findings made no reference to Curry's allegations that he had been, in effect, abandoned on a ward with 420 persons and no psychiatrist. The failure to make findings on these allegations suggests that the District Court may have misapprehended the applicable rule of law.

 Section 21–562 requires that "[a] person hospitalized in a public hospital for a mental illness shall, during his hospitalization, be entitled to medical and psychiatric care and treatment." We pointed out in Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1966), that this provision "was intended to cover persons hospitalized under any statutory authorization." It does not follow, of course, that every patient hospitalized for observation is immediately entitled to a full-blown therapeutic program. That does not suggest, however, that a person hospitalized involuntarily can be relegated to an unattended ward while hospital officials maintain the pretext that he is being observed and diagnosed. The purpose of the statutory right to treatment, we indicated in *Rouse,* was to obviate the "considerable constitutional problems that arise because 'institutionalized patients often re-

ceive only custodial care.' " [2] Similarly, there is a right in a person confined involuntarily for a limited period for purposes of "observation and diagnosis," *see* D.C. Code § 21–522, to be given the attention incident to such observation and diagnosis. Custodial care is no more justified by labelling it "diagnosis" than by labelling it "treatment."

 Curry alleges that he is receiving nothing more than custodial care. Taken on their face, his allegations suggest that the hospital has not yet taken any step toward observation and diagnosis, which are in turn essential steps in the therapeutic process if he is found to need treatment, and that he has merely been incarcerated as a troubled and troublesome individual. There is surely no irrebutable presumption that an involuntary patient is receiving an appropriate program of observation merely because he is hospitalized under a statute that permits "emergency observation and diagnosis." If Curry can support his allegations, he must either be released or be provided care that is consonant with the goals of observation and diagnosis, and ultimately of treatment if deemed necessary under the diagnosis.[3]

Accordingly, the District Court is directed to provide a hearing forthwith on Curry's allegations that the hospital has provided only custodial care. In considering Curry's remaining contentions we can thus be assured either that Curry is no longer subject to involuntary and pointless hospitalization, or that his continued hospitalization is predicated on a valid purpose.

Remanded.

2. 125 U.S.App.D.C. at 368, 373 F.2d at 453, quoting from Hearings Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on a Bill to Protect the Constitutional Rights of the Mentally Ill, 88th Cong., 1st Sess. 12 (1963).

3. Although the admitting doctor at St. Elizabeths made a tentative diagnosis of Curry as Schizophrenic, Paranoid Type, observation and diagnosis may reveal that the initial determination was erroneous and that no treatment was necessary. We do not suggest, in other words, that the hospital must begin treating an illness before it has reached a conclusion that some illness does exist. We hold only that the overall therapeutic process—which begins with observation and diagnosis to determine whether treatment is required— must be initiated as soon as the period of involuntary hospitalization begins.