UNITED STATES of America

v.

**Louis L. DUNN, Appellant.**

**No. 24597.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 4, 1971.

Decided Jan. 26, 1972.

Mr. Stephen P. Oggel, La Jolla, Cal. (appointed by this court) for appellant.

Mr. Charles F. Flynn, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before DANAHER, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.

I.

TAMM, Circuit Judge:

The question presented in this appeal is whether an 18½-month delay between arrest and trial is violative of the Sixth Amendment's guaranteed right to a speedy trial. During a large portion of this time appellant was in custody, either in prison or St. Elizabeths Hospital.

On November 2, 1968, appellant was arrested and charged with two counts of assault with intent to commit rape and with enticing a minor child to take indecent liberties with her in violation of D.C.Code, § 22–501 and § 22–3501(b). The chronology of what transpired between November 2, 1968 and May 14, 1970, the date on which the trial commenced, is so disturbing to us that we set it out in full. Following the arrest on November 2, 1968, appellant was held for arraignment which took place on No-

vember 4, 1968. At this time appellant was committed to St. Elizabeths Hospital by the District of Columbia Court of General Sessions (now the Superior Court of the District of Columbia) to determine appellant's competency. This was done as a result of a request by appellant's court-appointed counsel. Some two months later, on January 2, 1969, St. Elizabeths staff certified that Dunn was competent and responsible and able to stand trial. On January 7, 1969 the Court of General Sessions called the case but was forced to grant a continuance as the report from St. Elizabeths had not yet been received. The case was again called on January 14, 1969, and again continued for lack of a report from St. Elizabeths. On January 28, 1969 the letter from St. Elizabeths, certifying that appellant was competent, was finally received. At this time the court denied appellant's motion to dismiss and the case was set down for preliminary hearing on February 4, 1969. On that day the arresting officer was unable to attend since he was in North Carolina on emergency leave and the case was dismissed for want of prosecution; the appellant was released from custody after being detained for 95 days.

On February 14, 1969 a new arrest warrant was issued charging the same offenses. However, in this instance the charges were brought not in General Sessions, but rather, in the United States District Court for the District of Columbia. On May 2, 1969 Dunn was arrested on a charge of disorderly conduct and confined to the D.C. Jail, at which time appellant first became aware of the outstanding warrant in the instant case. Counsel for appellant was appointed by the court and a preliminary hearing was conducted on May 8, 1969, the result of which being the defendant's incarceration to await action by the grand jury. On June 18, 1969, the appellant was again committed to St. Elizabeths for another mental competency examination by order of the District Court, acting at the request of officials of the D. C. Jail,

where appellant had fought with another prisoner and set a fire. This was an *ex parte* proceeding, at which neither appellant nor his court-appointed counsel was present. Neither Judge Curran nor the Assistant United States Attorney was aware of appellant's earlier commitment to St. Elizabeths. On July 1, 1969 the grand jury returned an indictment charging appellant with the above-mentioned offenses. Despite Judge Curran's June 18, 1969 commitment order, Dunn remained in D. C. Jail until July 28, 1969, when he physically entered St. Elizabeths. Two days later appellant's counsel at trial filed a motion to dismiss the indictment for failure to prosecute. This motion was argued on August 22, 1969, and although it was not then decided, yet another commitment order was signed. In the interim St. Elizabeths informed the court and the Government that appellant had previously been examined and found competent in January 1969. This communication was dated September 29, 1969. In the ensuing months the case was called three times— on October 3, 1969, December 3, 1969, and January 5, 1970. In each instance the case had to be continued for lack of any report from St. Elizabeths relating to appellant's mental competence. In each of these three instances Dunn's counsel moved for dismissal, but each time the judge postponed ruling on the motion. Finally, after being incarcerated at St. Elizabeths since July 28, 1969, the Hospital reported, on February 20, 1970, that Dunn was both responsible and competent to stand trial. Competence was judicially certified on February 24, 1970. A conference was held on March 20, 1970, and trial was scheduled for and took place on May 14 and 15, 1970. Despite continuous attempts by appellant to obtain pre-trial release he remained in custody until trial commenced, notwithstanding a favorable recommendation for conditional release received on March 31, 1970 from the D. C. Bail Agency, which was rejected on April 14, 1970 by the Court of General Sessions.

In determining where the fault lies for each of these delays, the Government, in a memorandum requested by this court, asserts that of the total delay, 323 days are attributable to St. Elizabeths Hospital, the reason for 99 days of delay is unclear, while 56 days can be attributed to the courts, 55 to the appellant and 23 days for divers reasons all attributable to the Government. In the memorandum submitted by the appellant, 499 days of delay are computed as being attributable to the Government and 60 days to appellant. The parties are not always agreed as to which delays are attributable to which party, but it is interesting to note that their end results are approximately the same. Even by attributing the initial 60-day commitment at St. Elizabeths to appellant, which the Government does not seek to do, the total delay attributable to the Government would still be approximately 440 days. We find a delay of this nature to be both unexplainable and unjustifiable in light of the Constitution, Federal Rules of Criminal Procedure, the case law, and in fact, our entire historical and jurisprudential commitment to the concept of the speedy dispensing of justice.

It is not surprising that in drafting the Bill of Rights our founding fathers included the following in what was to become the Sixth Amendment to the Constitution:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . . .

At the time the Republic was in its embryonic stage the concept of speedy trial had a 610-year history. Writing for the Court in Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), Mr. Chief Justice Warren went to great lengths in setting out the history of an accused's right to a speedy trial. We quote at length from *Klopfer* in the hope of renewing the historical perspective of the precious Sixth Amendment guarantee:

> We hold here that the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. That right has its roots at the very foundation of our English law heritage. Its first articulation in modern jurisprudence appears to have been made in Magna Carta (1215), wherein it was written, "We will sell to no man, we will not deny or defer to 'any man either justice or right",[1] but evidence of recognition of the right to speedy justice in even earlier times is found in the Assize of Clarendon (1166).[2] By the late thirteenth century, justices, armed with commissions of gaol delivery and/or oyer and terminer[3] were

---

1. Magna Carta, c. 29 [c. 40 of King John's Charter of 1215] (1225), translated and quoted in Coke, The Second Part of the Institutes of the Laws of England 45 (Brooke, 5th ed., 1797). [Footnotes renumbered.]

2. "4. And when a robber or murderer or thief or receiver of them has been arrested through the aforesaid oath, if the justices are not about to come speedily enough into the country where they have been taken, let the sheriffs send word to the nearest justice by some well-informed person that they have arrested such men, and the justices shall send back word to the sheriffs informing them where they desire the men to be brought before them; and let the sheriffs bring them before the justices." 2 English Historical Documents 408 (1953).

3. An example of the Commission of gaol delivery is set forth in Goebel, Cases and Materials on the Development of Legal Institutions 53 (7th rev. 1946):

    "The lord king to his beloved and faithful Stephen de Segrave and William Fitz Warin, greeting. Know that we have appointed you justices to deliver our gaol at Gloucester, in accordance with the custom of our realm, of the prisoners arrested and held there. And hence we order you that in company with the coroners of the county of Gloucester you convene at Gloucester on the morrow of the festival of the Holy Trinity in the twelfth year of our reign [Monday, May 22, 1228], to deliver the aforementioned gaol, as aforesaid, for we have ordered our sheriff of Gloucestershire that at the aforesaid time and place he cause to come

visiting the countryside three times a year.[4] These justices, Sir Edward Coke wrote in Part II of his Institutes, "have not suffered the prisoner to be long detained, but at their next coming have given the prisoner full and speedy justice, . . . without detaining him long in prison.".[5] To Coke, prolonged detention without trial would have been contrary to the law and custom of England;[6] but he also believed that the delay in trial, by itself, would be an improper denial of justice. In his explication of Chapter 29 of the Magna Carta, he wrote that the words "We will sell to no man, we will not deny or defer to any man either justice or right" had the following effect:

> "And therefore, every subject of this realme, for injury done to him *in bonis, terris, vel persona,* by any other subject, be he ecclesiasticall, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the in-

jury done to him, freely without sale, fully without any deniall, and speedily without delay."[7]

Coke's Institutes were read in the American Colonies by virtually every student of the law.[8] Indeed, Thomas Jefferson wrote that at the time he studied law (1762–1767), *"Coke Lyttleton* was the universal elementary book of law students."[9] And to John Rutledge of South Carolina, the Institutes seemed "to be almost the foundation of our law."[10] To Coke, in turn, Magna Carta was one of the fundamental bases of English liberty.[11] Thus, it is not surprising that when George Mason drafted the first of the colonial bills of rights,[12] he set forth a principle of Magna Carta, using phraseology similar to that of Coke's explication: "[I]n all capital or criminal prosecutions," the Virginia Declaration of Rights of 1776 provided, "a man hath a right . . . to a speedy trial . . . ."[13] That this right was considered fundamental at this early period in our history is evidenced by its guarantee in the constitutions of several of the States of the

---

before you all the prisoners in the aforesaid gaol and all persons attached to appear against them and on account of them. In witness whereof, etc. Dated April 20, in the twelfth year of our reign."

"The Judges commissioned in a general oyer and terminer commission," Professor Goebel writes, "are ordered to inquire by grand jury of named crimes, from treasons to the pettiest offense, as to all particulars and to hear and determine these according to the law and custom of the realm." *Id.,* at 54.

4. *Id.,* at 54.

5. Coke, *op. cit. supra,* n. 8, at 43.

6. See *Ibid.*

7. *Id.,* at 55. "Hereby it appeareth," Coke stated in the next paragraph, "that justice must have three qualities, it must be *libera, quia nihil iniquius venali justitia; plena, quia justitia non debet claudicare; et celeris, quia dilatio est quaedam negatio;* and then it is both justice and

right." Later in the explication of Chapter 29, Coke wrote that in conformity with the promise not to delay justice, all of the King's "commissions of oier, and terminer, of goale delivery, of the peace, &c. have this clause, *facturi quod ad justitiam pertinet, secundum legem,* and *consuetudinem Angliae,* that is, to doe justice and right, according to the rule of the law and custome of England. . . ."

8. See Warren, History of the American Bar 157–187 (1911); Meador, Habeas Corpus and Magna Carta 23–24 (1966).

9. Quoted in Warren, *op. cit. supra,* n. 15, at 174.

10. Quoted in Bowen, The Lion and the Throne 514 (1956).

11. See Coke, *op. cit. supra,* n. 8, at A4 (Proeme).

12. See 1 Rowland, The Life of George Mason 234–266 (1892).

13. See Va. Declaration of Rights, 1776, § 8.

new nation,[14] as well as by its prominent position in the Sixth Amendment. Today, each of the 50 States guarantees the right to a speedy trial to its citizens.

Klopfer v. North Carolina, *supra*, at 223–226, 87 S.Ct. at 993–995.[15] This somewhat lengthy dissertation clearly establishes the basic nature of this fundamental right, all too frequently paid only token lip-service by the courts.

■ Nowhere is the right to speedy trial seriously doubted, although in some cases there has been significant delay which has been explained away by the court as being nonprejudicial to the defendant,[16] or as being a safeguard to defendant's right to a fair trial,[17] or by stating the delay is merely relative and must be measured against the rights of the public.[18] Even though the cases decrying delays and simultaneously affirming convictions are many, the Chief Justice wrote only recently:

The right to a speedy trial is not a theoretical or abstract right but one rooted in hard reality in the need to have charges promptly exposed. If the case for the prosecution calls on the accused to meet charges rather than rest on the infirmities of the prosecution's case, as is the defendant's right, the time to meet them is when the case is fresh. Stale claims have never been favored by the law, and far less so in criminal cases. Although a great many accused persons seek to put off the confrontation as long as possible, the

14. See Del.Const., 1792, Art. I, § 7; Md. Declaration of Rights, 1776, Art. XIX; Pa. Declaration of Rights, 1776, Art. IX; Va. Declaration of Rights, 1776, § 8. Mass.Const., 1780, Part I, Art. XI, provided:

"Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character. He ought to obtain right and justice freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws."

This has been construed as guaranteeing to all citizens the right to a speedy trial. See Commonwealth v. Hanely, 337 Mass. 384, 149 N.E.2d 608 (1958). A similar provision was included in the New Hampshire Constitution of 1784, Part I, Art. XIV.

Kentucky, Tennessee, and Vermont, the three States which were admitted to the Union during the eighteenth century, specifically guaranteed the right to a speedy trial in their constitutions. See Vt.Const. 1786, c. I, Art. XIV; Ky.Const.1792, Art. XII, § 10; Tenn.Const.1796, Art. XI, § 9.

15. For a further discussion of the historical development of the speedy trial doctrine see Petition of Provoo, 17 F.R.D. 183, 196–197 (D.Md.), aff'd per curiam 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955).

16. *See, e. g.,* United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317 (1971);

Bynum v. United States, 133 U.S.App. D.C. 4, 408 F.2d 1207 (1968); Harling v. United States, 130 U.S.App.D.C. 327, 401 F.2d 392 (1968); Dockery v. United States, 129 U.S.App.D.C. 243, 393 F.2d 352 (1968); Mathies v. United States, 126 U.S.App.D.C. 98, 374 F.2d 312 (1967); Hedgepeth v. United States, 125 U.S.App.D.C. 19, 365 F.2d 952 (1966); Hardy v. United States, 119 U.S.App.D.C. 364, 343 F.2d 233 (1964), cert. denied, 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965); Smith v. United States, 118 U.S.App.D.C. 38, 331 F.2d 784 (en banc, 1964); Mann v. United States, 113 U.S.App.D.C. 27, 304 F.2d 394 (1962).

17. *See* United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); Blunt v. United States, 131 U.S.App. D.C. 306, 404 F.2d 1283 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 21 L.Ed.2d 221 (1969); Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363 (1965).

18. *See generally* Beavers v. Haubert, 198 U.S. 77, 86–87, 25 S.Ct. 573, 49 L.Ed. 950 (1905); Evans v. United States, 130 U.S.App.D.C. 114, 397 F.2d 675 (1968); Wilkins v. United States, 129 U.S.App. D.C. 397, 395 F.2d 620 (1968); Dockery v. United States, 129 U.S.App.D.C. 243, 393 F.2d 352 (1968); Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363 (1965); Stevenson v. United States, 107 U.S.App.D.C. 398, 278 F.2d 278 (1960).

right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial. This is brought sharply into focus when, as here, the accused presses for an early confrontation with his accusers and with the State. Crowded dockets, the lack of judges or lawyers, and other factors no doubt make some delays inevitable. Dickey v. Florida, 398 U.S. 30, 37–38, 90 S.Ct. 1564, 1568–1569, 26 L.Ed.2d 26 (1970). In practice Congress has placed a provision in the Federal Rules of Criminal Procedure which requires dismissal of a case against a defendant in the case of undue delay. "If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint." Rule 48(b), Fed.R.Crim.P. Similarly, Congress has placed an even greater onus on the district court in cases where the defendant is incarcerated rather than released on bail. Rule 46(h), Fed.R.Crim. P. It is clear that "the burden is on the Government, not the defense, to bring a case to trial." Smith v. United States, 135 U.S.App.D.C. 284, 288, 418 F.2d 1120, 1124 (1969), citing McNeill v. United States, No. 21,570, (D.C.Cir. June 4, 1968) (unreported).

In certain cases this court has found the delay alleged by defendants not to be "arbitrary, capricious, or vexatious" and has consequently allowed convictions in such cases to stand. In such cases we have either dealt with delays which were not of long duration, Hedgepeth v. United States, 124 U.S.App.D.C. 291, 364 F. 2d 684 (1966); Harling v. United States, 130 U.S.App.D.C. 327, 401 F.2d 392 (1968), cert. denied, 393 U.S. 1068, 89 S. Ct. 725, 21 L.Ed.2d 711 (1969), or where the case has been of such a complicated nature as to require more time than would usually be permissible, Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363 (1965); Mann v. United States, 113 U.S.App.D.C. 27, 304 F.2d 394, cert. denied, 371 U.S. 896, 83 S.Ct. 194, 9 L.Ed.2d 127 (1962). In other instances, it has been said that a deliberately slow pace should be taken in order to protect the rights of the accused. In Blunt v. United States, 131 U.S.App.D.C. 306, 404 F.2d 1283 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 21 L.Ed.2d 221 (1969), this court held a 21-month delay to be permissible where 15 of the 21 months were devoted to mental examinations of the defendant. In *Blunt*, we said: "where a principal cause of postponement is the deliberate pace of the system of safeguards designed to protect the accused, the courts have been exceedingly reluctant to find constitutional infirmity even in very long delays." Blunt v. United States, *supra*, 131 U.S.App. D.C. at 310, 404 F.2d at 1287. Similarly, we have allowed convictions to stand in certain instances where the administration of justice has dictated that certain priorities be followed in dealing with criminal cases. In Wilkins v. United States, 129 U.S.App.D.C. 397, 395 F. 2d 620 (1968), we allowed a conviction to stand where there had been a 16½-month delay which had been occasioned by a policy of bringing imprisoned defendants to trial prior to defendants who had been released pending trial. The Supreme Court held that a 19-month delay was not violative of the Sixth Amendment when there had been more than one indictment.

We cannot agree that the passage of 19 months between the original arrests and the hearings on the later indictments itself demonstrates a violation of the Sixth Amendment's guarantee of a speedy trial. This guarantee is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself. However, in large measure because of the many procedural safeguards provided an accused, the ordinary pro-

cedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself. Therefore, this Court has consistently been of the view that "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." Beavers v. Haubert, 198 U.S. 77, 87 [, 25 S.Ct. 573, 576, 49 L.Ed. 950.] "Whether delay in completing a prosecution . . . amounts to an unconstitutional deprivation of rights depends upon circumstances. . . . The delay must not be purposeful or oppressive," Pollard v. United States, 352 U.S. 354, 361 [, 77 S.Ct. 481, 486, 1 L.Ed.2d 393.] "[T]he essential ingredient is orderly expedition and not mere speed." Smith v. United States, 360 U.S. 1, 10 [, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041.] United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966) (footnote omitted). *See also* Hedgepeth v. United States, *supra.*

█ Another line of decisions, however, holds that the delay in question is indeed violative of the defendant's right to a speedy trial. In the case of Williams v. United States, 102 U.S.App.D.C. 51, 250 F.2d 19 (1957) we determined that defendant had been denied his right to a speedy trial after spending a year in St. Elizabeths Hospital and six years in prison. The Supreme Court has recently held that right to speedy trial would apply even to a defendant imprisoned in another jurisdiction, Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L. Ed.2d 607 (1969). Similarly, we have held a three-year delay in issuing an indictment while defendant was in a New York prison to be violative of basic constitutional rights. Taylor v. United States, 99 U.S.App.D.C. 183, 238 F.2d 259 (1956). We have also dismissed an indictment and reversed a conviction in a case where, because of appellant's in-

carceration in Maryland, his trial suffered a 21-month delay. Coleman v. United States, 142 U.S.App.D.C. 402, 442 F.2d 150 (1971). We held this to be violative in light of the fact that defendant could no longer find all of his witnesses and that the delay was so long. The abuses in all of these cases are evident to even the most untrained and least sensitive of observers, but an abuse need not be offensively blatant in order for the court to take notice. Admittedly we are blessed with 20/20 hindsight and certain cases which appeared not to be offensive at first blush prove to affect us differently after sufficient time for unhurried reconsideration. Accordingly, based on the record before us we reverse the conviction.

Although it was not directly raised on appeal, there is one further issue to which we must speak. A substantial segment of the delay in this case can be directly attributed to St. Elizabeths Hospital. As the facts indicate, the trial had to be postponed time and again because of lack of a report from the Hospital. Even the Government attributes 323 days of the delay to the Hospital. It appears that Dunn was lost in the shuffle and only after repeated inquiry could a report on him be presented to the district court. We have recently taken St. Elizabeths to task with reference to the right of treatment, *see* In Re Curry, 147 U.S.App.D.C. 28, 452 F.2d 1360 (1971), and Ashe v. Robinson, 146 U.S.App.D.C. 220, 450 F. 2d 681 (1971). We now alert the responsible parties as to the duty of dealing with those the court sends for observation in such a manner as to expedite their stays as much as possible in light of contemporary, established and accepted medical standards.

## II.

Criminal matters involving questions of a constitutional nature are by no means new to the courts of our land, nor are such matters infrequently dealt with by appellate courts in this or any other circuit. In this circuit a majority of our time is expended on criminal appeals in-

volving a myriad of legal questions which impose a heavy burden on the court. We do not face a burden solely because of the quantity of such litigation, but rather, because we are hard-pressed to expedite all of those matters which we must consider—civil as well as criminal—in order to see that justice is done and the rights of the accused protected, for only then are the rights of the entire society protected.

Under our doctrine of separation of powers, the administration of justice is the responsibility of the judiciary and it is a responsibility which the courts do not take lightly. This is the prime reason for our existence. All of this, of course, is all too familiar litany and it is therein that the problem lies. We in the judiciary, as those in the other branches of government, often engage in a plethora of verbiage and a paucity of action when dealing with questions of constitutional vintage. The problem of which I speak is amply exemplified by the manner in which the courts have dealt with the Sixth Amendment guarantee to a fair and speedy trial.

Indeed, the right was recognized in the embryonic stage of our Republic when our founding fathers promulgated the Bill of Rights—the first ten amendments to the Constitution. The Fourth, Fifth, Sixth and Eighth Amendments were all designed to safeguard the rights of the populace and to guarantee protection from the type of tyrannical rule from which the Revolution sought to free a fledgling nation. The Fourth and Fifth Amendments were designed to protect all of the populace while the Sixth and Eighth Amendments aimed with specificity at the rights of those persons who stood accused in criminal prosecutions. The Sixth Amendment, certainly a most integral part of this most basic of all American documents, guarantees the rights of those accused.

## AMENDMENT VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defense.

So important, in fact, were these rights that the amendment was early construed as being applicable not only to citizens of the states, but also to the denizens of the District of Columbia, Callan v. Wilson, 127 U.S. 540, 88 S.Ct. 1301, 32 L.Ed. 223 (1888), and the inhabitants of the incorporated territories, Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879); Lovato v. New Mexico, 242 U.S. 199, 37 S.Ct. 107, 61 L.Ed. 244 (1916), although it has been deemed inapplicable to citizens of unincorporated territories, Balzac v. Porto Rico, 258 U.S. 298, 304–305, 42 S.Ct. 343, 66 L.Ed. 627 (1922).

In 1905, the right to speedy trial suffered a major set-back which, as we shall see, it has never really been able to overcome. The United States Supreme Court, in the case of Beavers v. Haubert, 198 U.S. 77, 25 S.Ct. 573, 49 L.Ed. 950 (1905), stated that "[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances." *Id.* at 87, 25 S.Ct. at 576. These two sentences have created a guise which has countenanced inaction where action should have lain, and has promoted injustice when justice has cried to be heard. In case after case the courts have spilled thousands of gratuitous words concerning the right to speedy trial and have proceeded to affirm conviction after conviction, thereby compounding injustice with further injustice. Let it not be said that I believe for a moment that such actions were attempts at subterfuge of this basic constitutional right, but rather, it is my belief that after looking at the teaching of the Court in *Beavers*, the doctrine has suffered an involuntary dilution and a gradual erosion. However, the time has come for

jurists throughout the land to turn this ignominious tide. No less a judicial figure than the Chief Justice of the United States has spoken out about the deplorable delays in bringing both civil and criminal actions to prompt adjudication. As Mr. Chief Justice Burger said in his first State of the Judiciary Address to the American Bar Association in 1970:

If ever the law is to have genuine deterrent effect on the criminal conduct giving us immediate concern, we must make some drastic changes. The most simple and most obvious remedy is to give the courts the manpower and tools—including the prosecutors and defense lawyers—to try criminal cases within sixty days after indictment and then see what happens. I predict it would sharply reduce the crime rate.

Efficiency must never be the controlling test of criminal justice, but the work of the courts can be efficient without jeopardizing basic safeguards. Indeed the delays in trials are often one of the gravest threats to individual rights. Both the accused and the public are entitled to a prompt trial.

Burger, The State of the Judiciary—1970, 56 A.B.A.J. 929, 932 (1970). Nor has this been the only attempt to free us of this quagmire of judicial malignance. The Judicial Council of the United States Circuit Court for the Second Circuit has recently promulgated rules to assure the prompt disposition of criminal cases in that busy circuit. Under the terms of the rules in the Second Circuit a defendant who has been detained for ninety days without being brought to trial would, outside of a showing of extraordinary circumstances, be released in noncapital cases on bond or on his own recognizance. "This shall not apply to any defendant who is serving a term of imprisonment for another offense, nor to

any defendant who, subsequent to release under this rule, has been charged with another crime or has violated the conditions of his release." Rule 3, Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, promulgated January 5, 1971, as amended May 24, 1971 at 2. These rules continue:

4. In all cases the government must be ready for trial within six months from the date of the arrest, service of summons, detention, or the filing of a complaint or of a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest. If the government is not ready for trial within such time, or within the periods as extended by the district court for good cause under rule 5, and if the defendant is charged only with non-capital offenses, then, upon application of the defendant or upon motion of the district court, after opportunity for argument, the charge shall be dismissed.

*Id.* Among the various limitations contained in Rule 5 is the proceeding to determine competency, time for pretrial motions, interlocutory appeals, and trials on other charges. Similarly, delays in the interest of justice requested by the defendant or his counsel will not act as a prejudice to the government. While this undoubtedly increases the burden on all those involved in the criminal prosecution—*viz.*, the police, the prosecutor, the defense counsel and the courts—these burdens must be borne with the ultimate realization that justice delayed *is* justice denied. It is not for us to determine here what steps should be taken to maximize judicial efficiency but I do point out the need for greater strides in this essential area.[19]

The American Bar Association authorized a three-year study in 1964 by a blue-

19. In the recently released Report of the Court System Study Commission to the Governor and The General Assembly of Virginia (1971), it has been recommended that the criminal justice system be streamlined by dispensing with a grand jury proceeding in any cases where a preliminary hearing was held in a court of record and probable cause found. The Commission went on to state: Contingent upon changing the grand jury system . . . the Commission recommends revision of the statutes which set the standards for a speedy trial, now expressed by terms of court, to require trial (with certain excep-

ribbon panel known as the Advisory Committee on the Criminal Trial. In May 1967 the American Bar Association Project on Minimum Standards for Criminal Justice issued a tentative draft of a work entitled "Standards Relating to Speedy Trial." This draft was approved by the A.B.A. House of Delegates in February 1968. The Introduction to the Approved Draft begins:

> CONGESTION in the trial courts of this country, particularly in urban centers, is currently one of the major problems of judicial administration. Notwithstanding the usual rule that criminal cases have priority over civil cases, this congestion has created serious difficulties for the administration of criminal justice. The continued pressures upon existing resources have been such that it is extremely difficult to dispose of all criminal cases with promptness and with fair procedures.

American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Speedy Trial, Approved Draft, 1968, at 1. Part IV of the proposed standards relates to the consequences of denial of speedy trial.

4.1 Absolute discharge.

> If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, the consequence should be absolute discharge. Such discharge should forever bar prosecution for the offense charged and for any other offense required to be joined with that offense. Failure of the defendant or his counsel to move for discharge prior to trial or entry of a plea of guilty should constitute waiver of the right to a speedy trial.

*Id.* at 40.

It was not long ago, in Smith v. United States, 135 U.S.App.D.C. 284, 418 F.2d 1120 (1969), that Judge Leventhal wrote:

> We have considered whether the time has come to adopt a rule that for persons in detention, a delay prior to trial of more than one year, not attributable to the defense, automatically calls for dismissal of the indictment, due to prejudice to the person. Certainly there must be some limit on such delay, and an indictment may be dismissed with no showing of prejudice to the defense, as appears from the extreme case that came before the court in Petition of Provoo, D.Md., 17 F.R.D. 183, affirmed 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955).

135 U.S.App.D.C. at 286, 418 F.2d at 1122. However, in that case the court declined to adopt the one-year rule because of what Judge Leventhal termed "an unusual strain upon prosecutorial and judicial resources." *Id.* It was made clear that such a delay would create a heavy burden for the prosecution in that they would have to show that the defense suffered no prejudice. In his partial concurrence and partial dissent Judge Wright noted our words in our first *Hedgepeth* decision:

> . . . the very assumption of the Sixth Amendment is that unreasonable delays are by their nature prejudicial. It is not generally necessary for the defendant to demonstrate affirmatively how he has been prejudiced by an unreasonable delay.

135 U.S.App.D.C. at 287, 418 F.2d at 1123 (Wright, J. concurring in part and dissenting in part) *quoting* Hedgepeth v. United States, 124 U.S.App.D.C. 291, 293, 364 F.2d 684, 686 (1966). I would now undertake to adopt just such a one-year rule. I would calculate this period

---

tions) within 120 days of indictment *or* finding of probable cause. Although 120 days is a considerable time, the time period now outlined by the statute can be longer. Revision of the statute as outlined will make the time period clear and uniform, and will bring some pressure to expedite criminal matters.

In addition, it should be remembered that the attorney for the defendant, as an officer of the court, also has a responsibility to expedite trials, and to refrain from filing pleadings or requesting continuances for dilatory purposes. *Id.* at 92–93.

from the date on which the formal charge against the defendant is brought in cases where the defendant is in custody on that date. Where the defendant is not in custody on the date of bringing of formal charges the year should begin to run from the date of his apprehension. It is my belief that this method of calculating the period of one year is in line with the requirements of the Constitution and will not allow for the potential abuses that could arise if we calculated from either the date of the offense or the date of the indictment. No longer can we sit by and watch unconscionable delay being justified by equally unconscionable judicial verbiage. The time has come for us to clean our own house before looking to the evils that lie beyond.

Of course this rule of a one-year *maximum* delay, would not have universal application. Realistically certain cases require more than a year to bring to trial. These cases are exemplified by complex tax fraud cases or criminal violations of the anti-trust laws and securities laws and other cases of this genre; however, even in such cases we should not permit more time than is absolutely necessary in bringing these matters to trial. On the other hand, some cases can be brought to trial in far less than a year and should be so disposed of in such lesser time. The criminal prosecution must proceed within the bounds established by the Constitution.

The pendantic consideration afforded the very real issue of right to a prompt trial has placed Sixth Amendment guarantees in perpetual danger of defloration. The belief has too long prevailed that the courts must palliate that which seemed too difficult to cure. Our crotchets that somehow we are obliged to ignore the passage of time because of the problems involved in a complex system of criminal justice has, I fear, caused us in too many cases to be politely wrong. Too often our opinions in this area have displayed a coxcombry that we should now confront and admit. Our homage records more of a love for the words "speedy trial" than for the fact of such a trial. The shifting nuances by which we have achieved a predetermined result in most cases emphasizes the serious need for a basic identifiable standard. Our undoubted, if dubious, genius for telescoping even the passage of years into a concept of speedy trial indicates our complete willingness to use rather than to define these words. The resulting olio is to me obviously out of plumb with the basic demands of the constitutional guarantee. Instead then of turning out packaged emotions varnished with colorful but meaningless legal phrases, I believe we should abandon our time honored practice of retrospectively justifying obvious lesions on the Constitutional mandate. I urge my colleagues to conserve the living tree of the Sixth Amendment, but to discard the dead wood resulting from much too much discussion of the topic but not the issue. I regret that my colleagues are unwilling to join in this proposal at this time.

Reversed.

DANAHER, Senior Circuit Judge (concurring, and dissenting in part):

I concur in the result, and in Part I of Judge Tamm's opinion.

I do not join in Part II. Rather, even if the problem is to be approached and resolved in accordance with Judge McGowan's recommendations, utmost caution is an essential prerequisite to the adoption of a rule which would call for *automatic* dismissal of a criminal charge, allegedly pending too long.

I can understand that there is a tendency toward the promulgation of such a rule to be applied in behalf of an accused *incarcerated* throughout a period of *unnecessary* delay. Federal Rules of Criminal Procedure 46(h) and 48(b) as approved by Congress, both utilize as their touchstone the words "unnecessary detention" and "unnecessary delay," respectively. Rule 48(b) presently is merely permissive, but does authorize dismissal in the prescribed circumstance. Thus the Rule obviously takes into account as does our case law, that what

may be "necessary" delay may well turn upon the factual background in a given situation, for the rights of *society* must be considered. Surely the Court meant that much when it said only six years ago in United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966):

> However, in large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect *both* upon the *rights of the accused and* upon *the ability of society to protect itself*. Therefore, this Court has consistently been of the view that "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." Beavers v. Haubert, 198 U.S. 77, 87 [, 25 S.Ct. 573, 576, 49 L.Ed. 950.] "Whether delay in completing a prosecution . . . amounts to an unconstitutional deprivation of rights depends upon the circumstances. . . The delay must not be purposeful or oppressive," Pollard v. United States, 352 U.S. 354, 361 [, 77 S.Ct. 481, 486, 1 L.Ed.2d 393.] (Emphasis added).

Considerations to be weighed, according to *Ewell*, include:

> (1) a Congressionally prescribed statute of limitations "which is usually considered the primary guarantee against bringing overly stale criminal charges," 383 U.S. at 122, 86 S.Ct. at ·777;

> (2) possible *prejudice* in preparing a defense, found wanting in *Ewell* since the claim there was "insubstantial, speculative and premature." The *Ewell* defense had mentioned "no specific evidence which has actually disappeared or has been lost, no witnesses who are known to have disappeared," 383 U.S. at 122, 86 S.Ct. at 777;

> (3) the position of the Government, for the "problem of delay is the Government's too, for it still carries the burden of proving the charges beyond a reasonable doubt," 383 U.S. at 122–123, 86 S.Ct. at 777–778;

> (4) and in any event, the Court must be satisfied that no "oppressive or culpable Governmental conduct" has been a factor in the delay, 383 U.S. at 123, 86 S.Ct. at 778. Compare Dickey v. Florida, 398 U.S. 30, 38, 90 S.Ct. 1564, 1569, 26 L.Ed.2d 26 (1970) where the outrageous delay, seen to have been "exclusively for the convenience of the State," was denounced as "intolerable" in fact and "impermissible as a matter of law."

The rights of society surely must be considered as in situations where at a given time, the Government, without fault on its part, lacks adequate evidence to secure an indictment, or even thereafter to prosecute until a previously reluctant witness has become available. See United States v. Augello, 452 F.2d 1135, 1138 (2 Cir. 1971). Again, early trial of one or more accused may be precluded where a principal defendant has become a fugitive, as in United States v. Binder et al., 453 F.2d 805, 809 (2 Cir. 1971).

In contemplating the possible scope of a so-called automatic dismissal rule, there is a very different problem where an accused is at liberty pending trial, United States v. McCray, 140 U.S.App. D.C. 67, 433 F.2d 1173 (1970), as distinguished from the situation where the defendant has been incarcerated awaiting trial. See the discussion in the respective opinions in Smith v. United States, 135 U.S.App.D.C. 284, 418 F.2d 1120 (1969).

Society's interests as well as those of the accused have not gone unnoticed in this Court. Just as certainly as in the instant case where reversal seems so clearly necessary, we have taken account of factors which tip the scales the other way. Consider, for example, Judge Robinson's excellent treatment in Hinton v.

United States, 137 U.S.App.D.C. 388, 392–394, 424 F.2d 876, 880–882 (1969) with its aggregation of the opinions stating our case law as applied to the delay issue. And see, United States v. Medley, 146 U.S.App.D.C. 396, 452 F.2d 1325 (1971), and the contrasting cases there cited.

It goes without saying that all of us will comport our thinking to whatever decisions may be evolved as a result of the course of action recently initiated by the Judicial Conference. Perhaps consideration will then be given to the questions raised by Justice Brennan, concurring in Dickey v. Florida, 398 U.S. at 39 et seq., 90 S.Ct. 1564, but left without "definitive answers," *Id.* at 56, 90 S.Ct. 1564. See generally United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the treatment in the majority opinion by Mr. Justice White and the discussion by Mr. Justice Douglas, concurring in the result.

For my own part, I am satisfied that the courts in future—as they well have done in the past—may properly be permitted to deal with these delay situations as they arise. If, however, the drastic remedy of automatic dismissal is to control when some stated period shall have elapsed before final disposition of a pending case, let the problems first receive the cautious and careful consideration of the rule-makers in the manner suggested by Judge McGowan.

McGOWAN, Circuit Judge (concurring separately):

I concur in the result and in Part I of Judge Tamm's opinion. My failure to join in Part II does not derive from any lack of sympathy with its purposes, but from the following reasons:

1. The promulgation of a rule providing for automatic dismissal in the event a criminal charge is not tried within a certain period seems to me more appropriately to be a function of the Judicial Council of the Circuit. Any such rule should have the benefit of collective exploration and consideration by all the judges, and it should be embodied in a formal rule which has been carefully drafted. There are a number of contingencies which need to be covered with precision, over and above the mere proscription of trial after a certain elapsed time. The precedent in this regard represented by the set of rules issued by the Second Circuit on January 13, 1971 is highly relevant to the manner in which an appellate court should proceed in this area.

2. The Judicial Conference of the United States on October 29, 1971 approved, and transmitted to the Supreme Court, a proposed amendment to Rule 50(b) of the Federal Rules of Criminal Procedure which in substance would require each district court to formulate a plan for the prompt disposition of criminal cases, which plan must include a fixed time limit within which the trial is to take place. A plan so formulated by the district court must be submitted for approval to a reviewing authority consisting of the Judicial Council of the Circuit and one judge of the district court. This reviewing authority, as well as the Judicial Conference of the United States, is given power to modify the plan at any time.

Thus there appears to have been a judgment by the Judicial Conference of the United States that the time limits on criminal trials should be fixed in the first instance by the district courts, subject to approval or modification by higher authority. There is obviously some merit in giving the district court, as the court most immediately affected, the opportunity of participating in the formulation of a limitation rule. Although it may be that an individual circuit should not feel disabled from acting at this time to propound such a rule, the question of whether to proceed in the face of the course of action initiated by the Judicial Conference is a factor to be considered by the Judicial Council.

3. The dimensions of the criminal case problem in the District Court of this Circuit will be substantially altered within a few months when, on August 1,

1972, it loses jurisdiction over the serious D.C. Code felonies which it presently has. It may well be that, divested of that jurisdiction, and having only Federal Code crimes to contend with, a limiting period for the trial of criminal cases would be more nearly of the order of six months (as the Second Circuit has prescribed) than the one year which Judge Tamm contemplates. The judgment of the District Court itself on that score would be highly relevant.