**UNITED STATES of America**

v.

**Charles L. CANTY, Appellant.**

**UNITED STATES of America**

v.

**Charles M. RICHARDSON, Appellant.**

**Nos. 23170, 23255.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1970.

Decided Oct. 6, 1972.

Rehearing Denied Nov. 21, 1972.

Messrs. Frederick S. Hird, Jr. and Martin F. Klingenberg, Washington, D. C. (both appointed by this Court), with whom Mr. James R. Worsley, Jr., Washington, D. C. (also appointed by this Court), was on the brief, for appellants.

Mr. William S. Block, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before McGOWAN and ROBINSON, Circuit Judges.*

PER CURIAM:

On the afternoon of January 31, 1967, appellants Canty and Richardson, together with a third man, were apprehended almost literally in the act of robbing a bank.[1] Within fifteen minutes of the robbery, the three men were brought to the front of the bank and lined up against a nearby fence. Observing the suspects from within the bank, witnesses to the holdup identified them as the robbers. Appellants were each indicted and ultimately tried and convicted of four counts of bank robbery, 18 U.S.C. § 2113(a) (1970), three counts of assault with a dangerous weapon, 22 D.C.Code § 502 (1967), and one count of carrying a dangerous weapon, 22 D.C.Code § 3204 (1967).[2] After careful consideration of the claims of error made in these consolidated appeals, we affirm each conviction on one count of bank robbery and one count of carrying a dangerous weapon but direct the vacation of the remaining counts of bank robbery and assault with a dangerous weapon.

*Canty*

Appellant Canty's principal and most troublesome claim of error relates to the delay of some twenty-five months between his arrest and trial. Appellant's chief defense was insanity, and, since the testimony of psychiatric witnesses for both prosecution and defense related to examinations of appellant that had taken place almost two years before the trial, it is his ability to present this defense that he claims was most seriously prejudiced by the delay. In conjunction with the alleged denial of speedy trial, appellant makes the additional claim that he was prejudiced because his attorney was not present during the psychiatric staff conference held at St. Elizabeths Hospital to determine his mental condition at the time of the offense and his competency to stand trial. Although, in his submission, such presence is comprehended within the Sixth Amendment's right to counsel, he urges that it was particularly essential here, in light of the delays, to his ability both to reconstruct the events of that conference at trial and adequately to cross-examine the psychiatrists who testified for the Government.

Recently, in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court held that speedy-trial issues are to be resolved by "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 529, 92 S.Ct. at 2192. Among the factors to be placed on the scale are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2192. None is "either a necessary or sufficient condition to" a speedy-trial deprivation; rather, "they are related factors and must be considered together with such other circumstances as may be relevant." *Id.*

---

* Chief Judge Bazelon was a member of the panel at the time this appeal was argued, but withdrew from participation in its consideration after submission but before decision.

1. At 2:30 p. m. several persons inside the bank saw three men approach; two of them entered the bank while the third was seen moving toward the bank's side entrance. Shortly after entering, the two men placed ski masks over their faces, told everyone to lie down on the floor, scooped about $7,600 (including certain specially marked bills, or "bait money") from four tellers' windows, and headed out the side door. On emerging from the bank, the fleeing robbers were greeted by several police officers who proceeded to arrest Canty on the spot and Richardson after a brief chase on foot.

2. The third man arrested was also indicted, but chose to plead guilty.

at 533, 92 S.Ct. at 2193. See also Hedgepeth v. United States, 125 U.S.App.D.C. 19, 21, 365 F.2d 952, 954 (1966). Before addressing the issue of a right to counsel at psychiatric staff conferences, we think it appropriate to consider first the reasons for the unfortunate delay in this case.

While appellant characterizes most of the time lapses here as "absolutely unnecessary governmental delay," a closer examination of the record reveals a somewhat different picture. Appellant was arrested on January 31, 1967. From February 8 to April 21, 1967 he was committed by the then District of Columbia Court of General Sessions to the D. C. General Hospital for a mental examination in connection with another case. On April 21, at his own request, appellant was committed for an additional two months to St. Elizabeths for a mental examination in the instant case; and on June 21, Dr. Cameron, Superintendent of St. Elizabeths, reported by letter to the trial court that (1) appellant [was competent to stand trial, (2) "[T]here is no indication that he was suffering from mental disease or defect on or about . . . January 31, 1967," and (3) these determinations were made on the basis of psychiatric and physical examinations throughout the period of commitment which culminated in a staff conference on June 7.

The first six months, therefore, were consumed by mental examinations, at least one of which the record indicates was at appellant's request. Delays occasioned by mental examinations of the defendant are not normally taken into account for purposes of determining the question of a denial of speedy trial. As Judge Bazelon has written in a leading opinion in this area:

> [W]here a principal cause of postponement is the deliberate pace of the system of safeguards designed to protect the accused, the courts have been exceedingly reluctant to find constitutional infirmity even in very long delays.

Blunt v. United States, 131 U.S.App.D.C. 306, 310, 404 F.2d 1283, 1287 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 21 L.Ed.2d 221 (1969) (affirming despite 21-month delay). See also ABA Project on Minimum Standards for Criminal Justice, Standards Relating To Speedy Trial § 2.3 (Approved Draft, 1968).

The record is less than clear as to the reasons for the delay subsequent to these examinations. While the Government must undoubtedly share some of the responsibility, it also appears that appellant either contributed to, acquiesced in, or suffered little prejudice from these lapses. Thus, on September 19, 1967, he was released on bond, and shortly thereafter committed an offense in Maryland for which he was detained in that state. On November 29, and again on December 18, 1967, the Government requested continuances in the trial. However, if appellant felt prejudiced by these delays or any of the delays preceding these dates, it is noteworthy that his counsel not only did not object to the Government's motions but also requested a further continuance himself on December 27.

■ On January 29, 1968, on learning of appellant's detention in Maryland, the Government requested and was granted decertification of his case from the trial calendar: and it was not until October 24, 1968 that the Government applied for a writ of *habeas corpus ad prosequendum* to bring appellant to trial. Following the Supreme Court decisions in Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969) and Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), this court has recognized that mere incarceration in another jurisdiction does not excuse or toll the Government's obligation to proceed expeditiously in every case. Coleman v. United States, 142 U.S.App. D.C. 402, 442 F.2d 150 (1971). This is not to say, however, that delays caused by incarceration in another jurisdiction are automatically dispositive of speedy trial questions; courts must

continue to weigh the totality of circumstances in each case to determine whether the public's interest in prosecuting offenders must yield to a right which the Supreme Court has recognized as "necessarily relative." Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950 (1905).

■■ In that balance, incarceration in another jurisdiction for another crime committed while out on bail cannot be viewed in precisely the same light as incarceration pending trial in the instant case. Where criminal calendars are congested, as was true at the time of the events here involved, the decision of the prosecutor to defer proceedings against someone held elsewhere in favor of proceeding against others in jail awaiting trial in his own jurisdiction is not entirely irrational, particularly in a case where, as here, the defendant not only indicated no desire for expedition but also requested a postponement himself.[3]

■ Here, in the nine months between the decertification of his case and the issuance of the writ of *habeas corpus ad prosequendum*, appellant neither sought nor expressed any desire to be brought to trial in the District of Columbia. Although failure to demand trial does not in itself constitute a waiver of a speedy trial claim, *see Barker* and *Coleman, supra*, it must nevertheless be considered for purposes of assessing appellant's claim of prejudice. In contrast, petitioners in Smith v. Hooey and Dickey v. Florida, *supra*, were incarcerated six and eight years respectively in other jurisdictions and filed numerous petitions to be brought to trial. And while the time of incarceration elsewhere in *Coleman* was not so great (approximately fifteen months), there also the appellant was brought to trial only after petitioning the United States Attorney to proceed with his case.

Nor do appellant's actions subsequent to his delivery in this jurisdiction suggest any desire or felt need for more expeditious proceeding. Although in December 1968, he filed a motion to *dismiss* his indictment for lack of speedy trial, this must be assessed in light of the fact that, as stated in the Government's brief without challenge, on November 6, 1968 he moved for a continuance of the trial date, on December 17 he moved for yet a third mental examination, and on January 9, 1969 he moved again for an additional continuance.

■ While the foregoing refutes appellant's contention that the preponderance of the delay here was wholly the result of inexcusable governmental neglect, we do not mean to suggest that the Government is entirely absolved from responsibility or that we in any way condone the extraordinary period of twenty-five months between arrest and trial. Even partially excusable delays may be grounds for dismissal if they result in substantial prejudice to the accused, the claim of which we now consider.

■ Appellant's claim of prejudice as to his ability to present a defense on the merits presents little difficulty.

3. Moreover, although we have rejected the argument that the commission of another crime pending bail constitutes a waiver of one's speedy trial claim, Coleman v. United States, 142 U.S.App.D.C. 402, 405 note 6, 442 F.2d 150, 153 note 6 (1971), that fact necessarily supplies some justification for at least part of the delay. When a defendant commits a crime elsewhere while out on bail, he must expect to incur at least the delays inevitably attendant on the other jurisdiction's instituting criminal proceedings against him, *e. g.*, the time spent on pre-liminary hearings, grand jury proceedings, trial preparation, and trial itself. Here, for example, the Government's motion to decertify appellant's case from the ready calendar was based on the fact that appellant was being held in Maryland pending grand jury action. Whether appellant's prosecution here could have been undertaken without interrupting proceedings in Maryland is speculative, but, absent unusual circumstances, we do not think that one jurisdiction is required to compete with another for the privilege of proceeding against a defendant first.

Although in his *pro se* motion to dismiss he alleged the death of one potential alibi witness and the faded memory of another, in light of the overwhelming testimony that police officers arrested him running out of the bank with a loaded revolver and a bag full of the bank's money, we are not persuaded that this putative alibi testimony would have had a significant chance of altering the jury's verdict on the merits.

As to his insanity defense, appellant alleges that the span of more than two years between the offense and trial and almost two years between his psychiatric examinations and trial, in conjunction with the absence of his counsel from the staff conference and the denial of his efforts to obtain the relevant hospital reports underlying the diagnosis of the government psychiatrists, fatally prejudiced his ability to present the defense and effectively to cross-examine the witnesses against him.

Appellant contends that he has a right under the Sixth Amendment's guarantee of assistance of counsel to the presence of his attorney at psychiatric staff conferences.[4]

Appellant relies chiefly on United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), where the Supreme Court held that a post-indictment identification lineup was a "critical stage" in a criminal prosecution, and that under the Sixth Amendment a defendant could not be denied the presence of his attorney at such a proceeding. Appellant's argument, in essence, is that psychiatric staff conferences are equally critical in the prosecution of defendants raising insanity defenses, and that *Wade* therefore compels the recognition of a right to counsel there as well. In Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695 (1969), we surveyed the arguments for and against this proposition, but reserved judgment pending a case where the question was more appropriately presented for resolution.[5] *Thornton* arose on a petition for mandamus, and we identified a number of problems—factual as well as legal—which any endeavor to decide the question would have to address. We pointed out that it was "anything but clear what guidance we should draw from *Wade* in this context", and concluded that "the complexity of the issues involved and the uncertain factual matrix within which they must be resolved persuades us that a solution should not be attempted in the context of this petition for a writ of mandamus." *Id.* at 236, 239, 407 F. 2d at 699, 702.

■ We are no more persuaded that an adjudication of the constitutional issue can safely be undertaken here. Although our *Thornton* opinion was announced two months before Canty's trial began, none of the information for which we expressed a need in *Thornton* has been developed.[6] A party asserting the unconstitutionality of governmental action has the burden of demonstrating

---

4. Appellant makes no claim that the absence of counsel deprived him of his Fifth Amendment privilege against self-incrimination, since no incriminatory statement of appellant's that he might conceivably have made at the conference was ever referred to by Dr. Platkin—the only testifying psychiatrist who had been present at the conference. *See* United States v. Marcey, 142 U.S.App.D.C. 253, 440 F.2d 281 (1971). *Compare* Lee v. County Court of Erie County, 27 N.Y.2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452 (1971).

5. The claimed Sixth Amendment right has been disallowed in United States v.

Baird, 414 F.2d 700 (2nd Cir. 1969); United States v. Albright, 388 F.2d 719 (4th Cir. 1968); United States ex rel. Wax v. Pate, 409 F.2d 498 (7th Cir. 1969); State v. Whitlow, 45 N.J. 3, 210 A.2d 763 (1965). *But see* Michigan v. Ranes, 385 Mich. 234, 188 N.W.2d 568 (1971), cert. denied, 405 U.S. 917, 92 S.Ct. 942, 30 L.Ed.2d 787 (1972); Lee v. County Court of Erie County, 27 N.Y. 2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452 (1971).

6. As we later point out, appellant's trial counsel simply objected to testimony concerning Canty's mental examination at the hospital.

it. *E. g.*, Toombs v. Citizens' Bank, 281 U.S. 643, 647, 50 S.Ct. 434, 74 L.Ed. 1088 (1930). That burden extends to production of the facts essential to a determination respecting the constitutional claim. See Borden's Farm Prods. Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281 (1934). Canty's trial counsel made no effort in that direction. We do not in these circumstances pursue the abstract right-to-counsel question which Canty urges.

We turn to appellant's claim that the fact of counsel's absence from the staff conference, when taken in the context of a twenty-five month delay and the unavailability of underlying hospital records, so prejudiced his ability to present an insanity defense as to require reversal. In February, 1967, appellant was examined in connection with another case by Drs. Durr and Grande at D.C. General Hospital, who, on February 27, reported to the D.C. Court of General Sessions the "impression" that he was "schizophrenic, paranoid type," and recommended his commitment to St. Elizabeths for further care and treatment. Appellant's counsel filed an appearance in this case on April 21, 1967, the same day appellant was committed by the District Court to St. Elizabeths for a mental examination. Though on notice of the commitment, counsel signified no interest in being permitted to be present during any of the examination procedures at St. Elizabeths and, in particular, made no request with respect to any staff conference. At the competency hearing on July 10, 1967, there was no objection of any kind to the finding of competency reported by St. Elizabeths, either in terms of the result or the procedures by which it was reached. When the case first came on for trial on December 18, 1968, appellant sought a further mental examination and acquiesced in the court's order that he be examined by Dr. Marland, an independent psychiatrist, who reported to the court on January 28, 1969 that appellant was competent and had been shamming insanity.

When the case came on finally for trial on March 3, 1969, Mr. Meyer Koonin, who had served as counsel for appellant since his original appearance in the case on April 21, 1967, first moved to dismiss for lack of a speedy trial. In support of that motion, he stated only that the long lapse of time since the date of the robbery on January 31, 1967, "has in fact robbed the defendant of any recollection that he may have had concerning his whereabouts, concerning the people with whom, if any, he was associated, and concerning any matters which could in fact go to matters of defense." The Government in opposition argued that there could be no prejudice for failure of recollection of the robbery since appellant was caught red-handed coming out of the bank with the stolen money. Further in support of his motion defense counsel referred to two witnesses who appellant had represented to him as capable of providing alibi testimony but who had died since his arrest.

With this motion denied, counsel next made a motion which he described as "in the nature of a motion for discovery and inspection of records, for the issuance of a subpoena *duces tecum* and the production of evidence favorable to the accused." (Tr. 6). Counsel then described the information requested in great detail. They included all statements or confessions made by appellant to the police department; the names and addresses of all prospective Government witnesses; all possessions of appellant taken from him at the time of his arrest or thereafter, or other physical evidence which the Government might use as evidence at the trial; all pictures of the lineups conducted and all papers or other documents prepared in connection with them; and "all other information and evidence which may be favorable to the accused, the existence of which is known or by the exercise of due diligence may become known to the government . . . ." One

item in this lengthy enumeration was as follows (Tr. 7):

"The results of reports of physical or mental examinations and scientific tests or experiments made in connection with this case, or copies thereof, including, but not limited to, all photographs and reports of comparisons of known and latent fingerprints of any persons made in connection with this case."

In opposition, the Government represented that it had no evidence in its files favorable to the accused, and that there were no confessions or fingerprints. Defense counsel made a lengthy statement in support of his argument, relying principally upon what he perceived to be a trend towards broader criminal discovery, and emphasizing the Government's obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At pages 10–11 of the transcript he stated his reasons for discovery of what he termed "scientific material." Among the reasons given in this regard was that "[e]xpert testimony cannot be effectively subjected to cross examination or rebuttal without ample opportunity pretrial to prepare appropriate material for that purpose." Other reasons were that any danger of intimidation of witnesses is slight; expert testimony is customarily viewed by the jury as having a high probative value; and counsel may wish to request appointment of independent experts to assist him in these areas. There is no particularized reference in counsel's argument to the records at St. Elizabeths and, indeed, it is far from clear that he had these records in mind. There is no reference in his argument in support of this motion to a potential insanity defense, as distinct from one on the merits towards which his discovery requests appeared to point. Certainly he did not focus the court's attention upon St. Elizabeths records in relation to any such defense.

His discovery motion having been denied, Mr. Koonin made a final motion to suppress identification testimony. Mr. Koonin also asked the court (Tr. 33) to issue subpoenas for the two doctors at D.C. General Hospital (which the court granted) so that he could "question them concerning their reports at the time their reports were made." He did not then or thereafter ask to be supplied with any records of D.C. General underlying those reports. The court reserved the question whether it would hear evidence on the identification suppression motion, and proceeded to a hearing out of the presence of the jury on the matter of appellant's competency.

At that hearing the Government first presented Dr. Marland. In the course of his testimony Dr. Marland said that he "saw the records at St. Elizabeths." (Tr. 38). The opinion he gave as to appellant's sanity was said by him to be founded upon an examination of those records as well as on two interviews. (Tr. 38). The opinion he gave as to apneurological tests which showed no brain damage. Mr. Koonin cross examined Dr. Marland briefly (Tr. 48–61). Dr. Marland repeated his statement that he had gone to St. Elizabeths and "looked at the records" (Tr. 49). Mr. Koonin's questions were directed principally to what happened during the interviews. The only question he asked about the St. Elizabeths records was with reference to the appearance therein of the report by the two D.C. General doctors. Recross examination (Tr. 57–61) was confined to what happened in the interviews, and the only reference to the St. Elizabeths records was a further reference to the fact that Dr. Marland had learned of the D.C. General report from the St. Elizabeths records. There were no other questions of any kind as to what the St. Elizabeths records were or what they showed.

The next witness for the Government was Dr. Platkin (Tr. 68). Shortly after his testimony began, and after he had identified the period of Canty's stay in the hospital as being from March 10,

1967 to June 23, 1967, this passage occurred (Tr. 70):

"Q. Doctor, can you tell us what your examination consisted of?

Mr. Koonin: Objection, if your honor please.

The Court: On what grounds?

Mr. Koonin: On the grounds that counsel for the defendant, or for the then inmate of St. Elizabeths hospital was not present at the examination or at any of the staff conferences resulting from the examination."

The court immediately overruled the objection, and Mr. Koonin did not pursue it by identifying any disadvantages from which he was suffering.

In the course of his direct examination, Dr. Platkin testified that he and Dr. Economon had been the two staff people who had participated in the staff conference. Dr. Platkin described the examinations and tests which had occurred prior to the staff conference. He referred to extensive neurological examinations in the form of electroencephalograms and echograms, as well as a report of a neurological examination by Dr. Lucas, the chief neurological officer. He also referred to the fact that the hospital file contained a personal history of appellant prior to his commitment, including an extensive interview with his father (Tr. 77). He described in some detail what was contained in the interview with the father.

Mr. Koonin's cross examination runs from pages 78 to 83. He elicited that Dr. Platkin had reviewed the hospital records again immediately before coming to court. The only question he asked about the content of the records was whether they contained "any notice to attorney about the holding of a staff conference." (Tr. 79).

Mr. Koonin then presented Dr. Grande, one of the D.C. General psychiatrists who had made the report recommending a further examination at St. Elizabeths. This examination was mainly directed to establishing the meaning of the report made by the D.C. General doctors, i. e., whether they had stated an "opinion" or merely an "impression" that appellant was mentally ill. At the end of the testimony Mr. Koonin moved for a further psychiatric examination, but this was denied. (Tr. 100–102).

At the trial itself, Mr. Koonin's witnesses were Drs. Durr and Grande, the two D.C. General psychiatrists who had made the report on appellant. The Government's rebuttal witnesses were Dr. Marland and Dr. Platkin. Dr. Marland's direct examination followed largely the pattern of his testimony at the competency hearing. He again referred to the fact that he had examined the St. Elizabeths records. In Mr. Koonin's cross examination (Tr. 604–620), the only question asked about those records was with respect to the report by the D.C. General doctors. At pages 614 to 616, Mr. Koonin did ask Dr. Marland what he had learned about appellant's personal history from the St. Elizabeths records, and Dr. Marland answered this question quite fully.

Dr. Platkin's testimony also followed that given by him at the competency hearing, although he described at greater length the procedures followed in making mental examinations at St. Elizabeths. He said that psychological tests are given, as are also physical examinations where needed. In the case of appellant (Tr. 628), he was given special brain tests. Also the St. Elizabeths social worker interviewed his father. All this information was before the staff conference. Dr. Platkin testified in detail about the nature and result of the neurological examinations, and about the personal history of appellant as revealed in the interview reports (Tr. 633–34).

On cross examination (Tr. 639–648) Mr. Koonin inquired as to Dr. Platkin's interpretation of the language used in the D.C. General report. He also asked some general questions about overcrowding at St. Elizabeths. The only question about the hospital records was as to whether they indicated how long the staff conferences lasted.

From the foregoing it is not apparent to us that, as of the time the insanity defense was presented, counsel for appellant had any particular interest in the St. Elizabeths records, apart from the fact that they contained the D.C. General report. His discovery motion was not focused on these records and, indeed, it appears likely that the scientific materials referred to in that motion related to matters bearing upon guilt or innocence of the act charged. The obvious thrust of that motion was against the possibility that the prosecution might be withholding from the defense evidence of this nature. The St. Elizabeths hospital records were not in the prosecutor's file; indeed, they were presumably available for examination by counsel if he had sought to see them prior to trial.

In any event, the nature of those records, and what they showed, were testified to at length by Dr. Platkin on direct examination, both at the pretrial hearing on competency and at the trial itself; and defense counsel did not seek on cross-examination to delve further into them. It would seem that defense counsel was more interested in preserving an appellate point about the absence of counsel from the staff conference than he was in bringing out by questioning fuller information about what happened in that conference and what was the nature and content of the hospital records relating to appellant. Under these circumstances we are far from being able to say that either counsel's absence from the conference, or denial of his generalized discovery motion, operated fatally to prejudice appellant's presentation of an insanity defense.

 Canty's remaining claim on this appeal challenges the admission at trial of the identification testimony of eyewitnesses to the robbery. This claim is based on the alleged suggestivity of the show-up conducted fifteen minutes after the robbery in front of the bank. Considered apart from the surrounding circumstances, the presentation of the suspects to the witnesses was, of course, potentially suggestive. However, since Russell v. United States, 133 U.S.App. D.C. 77, 408 F.2d 1280, cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969), this court has, as against both Fifth and Sixth Amendment claims, permitted the police to conduct prompt, on-the-scene identifications. Appellant attempts to distinguish Russell on the grounds that the show-up was conducted there at 5:00 A.M., where the formalities of a counselled line-up would have been inconvenient and time consuming, whereas here the show-up occurred at 2:30 in the afternoon. However, the rationale in Russell was not only to avoid unnecessary inconvenience; we also said there that

> prompt confrontations in circumstances like those of this case will "if anything promote fairness, by assuring reliability . . ." (citation omitted). This probability, together with the desirability of expeditious release of innocent suspects, presents "substantial countervailing policy considerations" which we are reluctant to assume the Supreme Court would reject. 133 U.S.App.D.C. at 81, 408 F. 2d at 1284.

The Supreme Court has recently, in Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), provided solid support for our Russell doctrine—explicitly, in respect of the Sixth Amendment right to counsel, and implicitly, in respect of its due process approach. Due process is always, in the interest of eliminating undue suggestivity, a limitation upon the particular manner in which a confrontation for identification may be carried out. We do not think that the confrontation in question here transgressed the permissible limits.[7]

### Richardson

 Like Canty, Richardson first claims a denial of his right to a speedy

---

7. We do, however, find it necessary, for reasons hereinafter discussed, to vacate certain of Canty's convictions. See note 20, infra.

trial. In Richardson's case, however, it is not necessary to analyze each stage of the delay, and thus apportion responsibility between the prosecution and defense. As we emphasized with respect to Canty, important—perhaps crucial—inquiries are whether Richardson suffered prejudice from the delay and whether he pressed his speedy-trial right. One significant form of prejudice is the prolonged detention which can be imposed on a defendant who is presumed innocent of the charges against him.[8] Yet during most of the twenty-five month period that preceded his trial, Richardson was free on bond. And he made no significant effort throughout that period to press for an immediate trial. While we do not mean to suggest that his silence amounted to a waiver of his right to a speedy trial, it does tend to undercut the inference of prejudice which could be drawn from the mere fact of delay.[9] Richardson did, to be sure, spend approximately four of the twenty-five months in confinement at St. Elizabeths, but it is important to note that the commitment was in response to his own request for an examination into his mental competency to stand trial.[10]

 Moreover, Richardson has made no showing that his ability to offer a defense at trial was in any way prejudiced by the delay that preceded trial. Instead, he urges us to adopt a *per se* rule that prejudice will be assumed after a certain amount of delay. However, in Barker v. Wingo, *supra*, the Supreme Court could "find no constitutional basis for holding that the speedy trial right can be quantified into a specific number of days or months." 407 U.S. at 523, 92 S.Ct. at 2188. And while we are free to exercise our supervisory powers in favor of a per se rule, *id.* at 522–523, 530, 92 S.Ct. at 2188, 2192 this court has previously declined to adopt such a rule in cases where the delay imposed greater hardships on the defendant than the hardships Richardson was forced to bear.[11] But even though Richardson made no effort to show prejudice, we have carefully considered the record to determine whether a claim of prejudice could reasonably be asserted. This is not a case where conviction rested almost exclusively on the testimony of a witness who might have been effectively cross-examined but for the passage of time.[12] The evidence against Richardson was very substantial, and it seems almost inconceivable that a more expeditious trial would have permitted the defendant to punch any significant holes in the prosecution's case.

 Richardson also challenges the in-court identification on the basis of the show-up outside the bank. The considerations that led us to reject Canty's claim in this regard apply equally here. Unlike Canty, however, Richardson

8. Barker v. Wingo, *supra*, 407 U.S. at 532–533, 92 S.Ct. at 2192–2193. *And see* Smith v. United States, 135 U.S.App.D.C. 284, 288, 418 F.2d 1120, 1124 (1969) (Wright, J., concurring and dissenting): There are two kinds of relevant prejudice: prejudice to the defendant's ability to defend against the charge, and prejudice to his person. Prejudice to the person takes the milder form of anxiety and stigma when the accused is released on bail. Its more virulent form, more oppressive to the accused and more destructive of the presumption of innocence, is extended pre-trial incarceration.

9. Barker v. Wingo, 407 U.S. at 526–533, 92 S.Ct. at 2190–2193. *See also* Smith v. United States, 135 U.S.App.D.C. 284, 418 F.2d 1120, 1124–1125 (1969) (Wright, J. Concurring and dissenting).

10. *See* Blunt v. United States, 131 U.S. App.D.C. 306, 404 F.2d 1283, 1287 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 21 L.Ed.2d 221 (1969).

11. *See, e. g.,* Smith v. United States, 135 U.S.App.D.C. 284, 418 F.2d 1120, 1122 (1969). In United States v. Dunn, 148 U.S.App.D.C. 91, 459 F.2d 1115 (1972), Judge Tamm indicated that he would adopt the one-year rule which the court had declined to adopt in *Smith*. 459 F.2d at 1124. Neither of the other two judges on the panel concurred in that part of Judge Tamm's opinion.

12. *Compare* Coleman v. United States, 142 U.S.App.D.C. 402, 442 F.2d 150 (1971).

argues that because none of the evidence ever placed him inside the bank, and his mere presence outside the bank was perfectly consistent with innocence, the danger of misidentification was greater. However, the testimony that Canty, after emerging from the bank, tossed the money to Richardson, that Richardson took flight, that the officer giving chase never lost sight of him, and that he was found in possession of a ski mask and a loaded revolver undercuts the force of this argument.

Richardson's remaining claims relate to the multiplicity of the counts under which he was tried, and these we find meritorious. Both appellants were indicted for four counts of bank robbery, 18 U.S.C. § 2113(a) (1970), one count for each of the four tellers robbed; three counts of assault with a dangerous weapon, 22 D.C.Code § 502 (1967), one count presumably for each person so assaulted; and one count of carrying a dangerous weapon without a license.[13] Richardson was sentenced to six to eighteen years concurrently on each bank robbery count, and one year on the carrying a dangerous weapon charge to run concurrently with the bank robbery sentences. On the assault with a dangerous weapon counts, however, Richardson was sentenced to three to nine years, the sentence to run consecutively to the bank robbery counts, bringing his total minimum and maximum sentence to from nine to twenty-seven years.

▆▆▆▆ With respect to the bank robbery counts, although Richardson received concurrent sentences, it cannot be assumed that a multiplicity of concurrent sentences will have no adverse consequences for appellant.[14] Thus notwithstanding the concurrency of the sentences, the question here is "[w]hat Congress has made the allowable unit of prosecution". United States v. Universal C. I. T. Corp., 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). *See also* Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955); United States v. Hopkins, 150 U.S.App. D.C. 307, 464 F.2d 816 (1972), at 822–823. Although there seem to be no cases precisely on point, we cannot agree with the Government's position that the robbery of each teller constitutes a separate "taking" within the meaning of the statute.[15] While it may be true that under general theft and robbery statutes, a defendant may be punished under separate counts for taking money from different people in the same transaction,[16] the statute here is not for theft or robbery against the person generally. The crime is *bank* robbery, and the statute is entitled "Bank Robbery and Incidental Crimes." There is no doubt here that only one transaction took place and that only one bank was robbed. Compare United States v. Hopkins, *supra*, at 823. Even assuming that the intent of the statute in this regard is not perfectly clear, the Supreme Court has held that, unless a statutory intent to permit multiple punishments is stated "clearly and without ambiguity, doubt will be resolved against turning a single transac-

---

13. *Cf*. United States v. Miller, 145 U.S. App.D.C. 312, 449 F.2d 974 (1971).

14. *See* Benton v. Maryland, 395 U.S. 784, 787–791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); United States v. Spears, 145 U. S.App.D.C. 284, 449 F.2d 946 (1971); United States v. Hooper, 139 U.S.App. D.C. 171, 432 F.2d 604 (1970); Holland v. United States, 384 F.2d 370 (5th Cir. 1967); United States v. Machibroda, 338 F.2d 947, 949 (6th Cir. 1964).

15. 18 U.S.C. § 2113(a) (1970) provides in part:
 Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank * * * [s]hall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

16. *See* Barringer v. United States, 130 U.S.App.D.C. 186, 399 F.2d 557 (1968), cert. denied, 393 U.S. 1057, 89 S.Ct. 697, 21 L.Ed.2d 698 (1969); *cf*. Ashe v. Swenson, 397 U.S. 436, 446, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

tion into multiple offenses". Bell v. United States, 349 U.S. 81, 84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). *See also* Heflin v. United States, 358 U.S. 415, 419–420, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); Ladner v. United States, 358 U.S. 169, 177–178, 79 S.Ct. 209, 3 L.Ed. 2d 199 (1958); United States v. Universal C. I. T. Corp., *supra.*

Richardson also challenges the imposition of consecutive sentences for assault, 22 D.C.Code § 502, on top of his sentence for federal bank robbery. The bank robbery statute requires the prosecution to prove that the defendant took money or other property from the bank "by force and violence, or by intimidation". 18 U.S.C. § 2113(a), and Richardson contends that assault with a dangerous weapon merged into the offense of federal bank robbery.

Traditionally,

> where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed 306 (1932). That test would seem to permit consecutive sentences here since assault with a dangerous weapon requires proof that a weapon was used, while it might be possible to rob a bank "by force and violence, or intimidation" even without the use of a dangerous weapon. And proof of assault with a dangerous weapon does not automatically prove robbery of a federally insured bank.

But even though the two provisions require different elements of proof, there must still be a determination that Congress intended the provisions to bear separate punishments when applied to a single act or transaction.[17] Plainly, Congress did see a distinction between assault with a dangerous weapon and robbery of a bank by force and violence, since the same statute which prohibits bank robbery by force and violence also makes it a crime to "[assault] any person, or [put] in jeopardy the life of any person by the use of a dangerous weapon or device" in carrying out a robbery of a federally-insured bank. 18 U.S.C. § 2113(d). While bank robbery by force and violence, § 2113(a), carries a maximum term of incarceration of twenty years, a defendant convicted of federal bank robbery accompanied by assault with a dangerous weapon, § 2113(d), can be jailed up to twenty-five years. But it does not follow from the existence of a parallel provision on bank robbery with the aid of a dangerous weapon that Congress intended to permit punishment for assault with a dangerous weapon under the District of Columbia Code on top of punishment for robbery of a bank by force and violence under the federal bank robbery statute. On the contrary, the existence of the parallel provision demonstrates that Richardson was prejudiced by an impermissible joinder of charges.

■ The federal bank robbery statute establishes a comprehensive scheme for prosecuting and punishing persons who rob federally-insured banks. The scheme subdivides the offense into a series of steps—a continuum running from entry with intent to rob, to robbery by force and violence, to robbery with the aid of a dangerous weapon, to robbery resulting in death or kidnapping. The scheme provides a penalty for each step of the offense, and increases the penalty as the offense becomes more aggravated. There are no gaps between the steps.

■ Instead of prosecuting Richardson entirely within the bank robbery scheme, the Government charged him with the lowest tier of robbery in the

---

17. *See, e. g.,* United States v. Spears, 145 U.S.App.D.C. 284, 449 F.2d 946 (1971); Irby v. United States, 129 U.S.App.D.C. 17, 390 F.2d 432 (1967) (en banc); Ingram v. United States, 122 U.S.App.D.C. 334, 353 F.2d 872 (1965); *cf.* Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958).

federal scheme and sought to punish him for assault, or the aggravated portion of the offense, by reaching out to a catch-all assault provision in the District of Columbia Code. By venturing outside the federal scheme, the prosecution was able to circumvent the scheme's carefully crafted hierarchy of penalties. Thus, Richardson was charged with federal bank robbery by force and violence (20-year maximum) and assault with a dangerous weapon under the District of Columbia Code (10-year maximum), and under that array of charges it was possible for the trial court to impose a sentence of up to thirty years. In fact, Richardson was sentenced to a maximum term of twenty-seven years. Yet if Richardson had been charged with the federal crime of assault with a dangerous weapon in connection with a bank robbery, he could have been jailed for no more than twenty-five years. At no point has the prosecution explained why it abandoned, in favor of a catch-all assault provision, the statutory scheme that deals specifically with bank robbery. Nor has it explained why Richardson should be subjected to multiple convictions and a sentence of twenty-seven years when Congress explicitly imposed a ceiling of one conviction and twenty-five years in prison on the punishment that can be meted out to one who commits the precise crime Richardson was alleged to have committed.

■■■ The punishment of Richardson for assault with a dangerous weapon in addition to bank robbery by force and violence was, in our view, plain error. In Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957), the Supreme Court prohibited the pyramiding of sentences under the federal bank robbery statute.[18] *Prince* held that it was error to impose separate punishments on robbery of a bank and on entry of a bank with intent to rob, reasoning that the enactment of the prohibition on entry with intent to rob was not designed to permit the imposition of a sentence greater than the maximum specifically authorized for robbery of a bank. And it is equally clear that a sentence for bank robbery with a dangerous weapon, which cannot exceed twenty-five years, cannot be extended by adding a sentence for robbery by force and violence.[19] Richardson was not sentenced under two counts of the federal bank robbery statute. But the effect of charging one count under the bank robbery scheme and another outside the scheme was effectively the same, that is to say, it permitted the Government to obtain a sentence longer than the maximum authorized under the highest tier of the bank robbery scheme.[20]

18. *See also* Heflin v. United States, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); United States v. Welty, 426 F.2d 615 (3d Cir. 1970); United States v. Leather, 271 F.2d 80 (7th Cir. 1959).

19. *See, e. g.,* Holland v. United States, 384 F.2d 370 (5th Cir. 1967); Bayless v. United States, 347 F.2d 354 (9th Cir. 1965).

20. *Cf.* 1 National Commission on Reform of Federal Reform of Criminal Laws, Working Papers 334 (1970)

One [policy against multiplication of charges and punishments in a single criminal proceeding] is that the legislature, by fixing a punishment for a crime, has determined the maximum level of penalty for that conduct. When the prosecutor is permitted to multiply a single act and to convert it into a series of criminal acts, each carrying cumulative punishments, the legislative policy is defeated.

The argument obviously applies with special force where Congress has established a comprehensive scheme for punishing a particular type of offense, with the amount of punishment carefully tied to the degree of aggravation of the offense.

We recognize, of course, that under the "separate sovereigns" doctrine, a state could prosecute a defendant for robbery or assault even though he had already been tried for federal bank robbery in a federal court. *See* Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970); Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). By invoking that doctrine, a state can bring a second prosecution and thus make it possible for a defendant to

Perhaps Richardson could have been convicted of bank robbery with the aid of a dangerous weapon, in which case a sentence of up to twenty-five years would have been permissible. But we obviously cannot convict him of an offense for which he was not even tried. Since it was error to join the assault count with the count charging bank robbery by force and violence, we are compelled to vacate the conviction on all counts of assault, leaving Richardson with a shorter sentence then he might have received if he had been properly charged.

 We do not suggest, of course, that the prosecution is barred from venturing outside the federal bank robbery scheme in order to charge offenses beyond the coverage of the scheme. In this case, for example, Richardson was convicted of one count of carrying a dangerous weapon, 22 D.C.Code § 2304. While the federal bank robbery scheme addresses itself to assaults committed in the course of a robbery, it is clearly unconcerned with the type of weapon he might use or with his right under local law to carry such a weapon. Richardson's conviction for carrying a dangerous weapon in no sense increases the penalty which could have been imposed under the federal scheme for the same criminal conduct. The prohibition on carrying a dangerous weapon is designed to serve interests that the federal bank robbery scheme does not purport to serve. Accordingly, the conviction for carrying a dangerous weapon can stand.

In each of these two cases, the convictions on one count of bank robbery, 18 U.S.C. § 2113(a) (1970), and one count of carrying a dangerous weapon, 22 D. C.Code § 502 (1967), are affirmed. The cases are remanded to the District Court with directions to vacate the convictions on all other counts and to resentence appellants accordingly.[21]

It is so ordered.

serve a longer sentence than Congress authorized in the federal statute. But that doctrine has no application here, since the bank robbery statute and the District of Columbia Code have both been enacted by the same sovereign—the federal government. *Cf.* Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 434–435, 52 S.Ct. 607, 76 L.Ed. 1204 (1932); Cohens v. Virginia, 19 U.S.(6 Wheat.) 264, 424–429, 5 L.Ed. 257 (1821); Neild v. District of Columbia, 71 App.D.C. 306, 309–311, 110 F.2d 246, 249–251 (1940). Accordingly, the double jeopardy clause clearly bars overlapping prosecutions under District of Columbia law and nationally-applicable federal law. *Cf.* Puerto Rico v. Shell Co., 302 U.S. 253, 264, 58 S.Ct. 167, 82 L.Ed. 235 (1937); Grafton v. United States, 206 U.S. 333, 354–355, 27 S.Ct. 749, 51 L.Ed. 1084 (1907); Sims v. Rives, 66 App.D.C. 24, 84 F.2d 871 (1936).

21. As we stated earlier, Canty, like Richardson was convicted on four counts of bank robbery, three counts of assault with a dangerous weapon, and one count of carrying a dangerous weapon. He was sentenced to imprisonment for six to eighteen years on each of the bank robbery counts, one to three years on each of the assault counts, and one year on the remaining count, all sentences to operate concurrently. While Canty, unlike Richardson, does not challenge the profusion of convictions, the plain error therein necessitates correction. Since we hold that the bank was robbed only once, we must vacate three of the four bank robbery convictions. And since we further hold that convictions of assault with a dangerous weapon under the District of Columbia Code cannot be added to a conviction of federal bank robbery, we must also vacate the assault convictions.